# EXHIBIT A

Westlaw.

Not Reported in F Supp 2d                                                                                   Page 1

Not Reported in F Supp 2d, 2000 WL 1481018 (D.Del.)

**(Cite as: 2000 WL 1481018 (D.Del.))**

C

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Margaret MCKAY, Plaintiff,
v.
DELAWARE STATE UNIVERSITY, Dr. William
B. DeLauder, Henry Tisdale, Dr. Johnny
Tolliver, Dr. Tossie Taylor, and Dr. William
Flayhart, Defendants.
**No. CIV.A. 99-219-SLR.**

Sept. 29, 2000.

Laurence V. Cronin, Esquire of Smith, Katzenstein,
& Furlow, Wilmington, Delaware. Counsel for
Plaintiff. Of Counsel: Mark B. Frost, Esquire of
Frost & Zeff, Philadelphia, Pennsylvania.

John D. Balaguer, Esquire and Marc S. Casarino,
Esquire of White & Williams, Wilmington,
Delaware. Counsel for Defendants.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 Plaintiff Dr. Margaret McKay filed this action
on April 7, 1999 against defendant Delaware State
University [FN1] ("DSU"), its President, Dr.
William B. DeLauder ("DeLauder"), its Vice
President of Academic Affairs until 1994, Henry
Tisdale ("Tisdale"), its Dean of the School of Arts
and Sciences, Dr. Johnny Tolliver ("Tolliver"), its
Vice President of Academic Affairs from 1994 to
1996, Dr. Tossie Taylor ("Taylor"), and Chairman
of its History, Political Science and Philosophy
Department, Dr. William Flayhart ("Flayhart").
Plaintiff alleges disparate treatment, discriminatory
discharge and retaliation under 42 U.S.C §§ 1981,
1983 and 1985, Title VII of the Civil Rights Act of

1964, 42 U.S.C. §§ 2000(e), *et seq.*, the Age
Discrimination in Employment Act and the
Delaware Discrimination in Employment Act. [FN2]
Plaintiff also alleges breach of contract, civil
conspiracy and violation of the Delaware
Constitution. (D.I.22) The court has jurisdiction
over plaintiff's federal claims pursuant to 28 U.S.C
§§ 1331 and 1343. The court has supplemental
jurisdiction over plaintiff's state claims pursuant to
28 U.S.C. § 1367. Currently before the court is
defendants' motion for summary judgment on all
counts of the complaint. (D.I.74) For the reasons
that follow, the court will grant in part and deny in
part defendants' motion for summary judgment.

> FN1. Prior to the fall of 1993, DSU was
> known as Delaware State College

> FN2. Plaintiff filed an Amended
> Complaint on September 13, 1999 in
> which she added claims under the Civil
> Rights Act of 1964, the Age
> Discrimination in Employment Act, and
> the Delaware Discrimination in
> Employment Act. (D.I.22)

II. BACKGROUND

This is a case of alleged employment
discrimination brought by a former tenured
professor against DSU and several members of its
administration and faculty in their individual and
official capacities. Plaintiff contends that she was
discriminated against based on her race, gender, age
and perceived disability in connection with her
performance as a faculty member, her repeated
requests for promotion and tenure, and her ultimate
dismissal from DSU In order to assess plaintiff's
claims, a review of the facts is necessary.

A. The Early Years of Employment

Plaintiff is a 71-year old Caucasian female. She

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)

**(Cite as: 2000 WL 1481018 (D.Del.))**

was first employed in August 1983 as an Assistant Professor of Political Science by DSU, a predominantly African-American educational institution. Shortly after arriving at DSU, plaintiff received critical evaluations from her peers. On October 25, 1983, Associate Professor of Political Science Dr. Joseph Spina ("Spina") expressed his "extreme ... disappoint[ment]" in plaintiff's performance, including her failure to begin developing the Political Science Internship Program ("Internship Program"), neglect in preparing a requested brochure for the Political Science curriculum, and her failure to post office hours and to spend sufficient time on campus. (D.I. 75 at A1) Spina also noted that the two classes plaintiff taught, Introduction to Political Science and Contemporary Political Ideologies, covered the same subject matter, and students had complained about plaintiff's disorganized teaching methods. (D.I. 75 at A2) Plaintiff received similar critical evaluations from Flayhart and Dr. James Valle ("Valle"), the Department Chair at that time. (D.I. 75 at A4-A10) Valle placed plaintiff on probationary status and postponed a recommendation for reappointment until the next scheduled evaluation in light of plaintiff's short time at DSU. (D.I. 75 at A10) In an October 31, 1983 letter, Valle informed plaintiff of the negative evaluation and provided her with suggestions on how to correct the deficiencies. [FN3] (D.I. 75 at A11)

> FN3. Valle also informed plaintiff that "some of our disquiet is clearly rooted in intangible eccentricities of behavior, missed and cancelled appointments, apparent inability to grasp the importance of the cooperative efforts we are asking of you, bare minimum adherence to office hours, and a general lack of the professional maturity and self-starting abilities that we had expected of a person of your experience and qualifications." (D.I. 75 at A12)

B. Promotion to Associate Professor and First EEOC Complaint

*2 In the fall of 1985, plaintiff sought promotion from Assistant to Associate Professor. On November 15, 1985, the Promotion and Tenure Committee of the History and Political Science Department ("Tenure Committee") recommended plaintiff for promotion to Associate Professor. In its report, the Tenure Committee, composed of Valle, Spina, Flayhart, and Chairman Dr. John Gardner ("Gardner"), noted that plaintiff is "willing to work with students far beyond her required office hours," "unusually vigilant in enforcing academic standards on such matters as plagiarism," "quite innovative in her teaching methods," and "interacts with her colleagues [and is] well-liked by members of the department." (D.I. 75 at A37-38) However, the Tenure Committee also cited three weaknesses: plaintiff's need to publish, her lack of organizational ability in the classroom, and her need to pursue long-term projects such as the Internship Program (D.I. 75 at A38) The Tenure Committee concluded that plaintiff's strengths "substantially outweigh[ed]" her weaknesses and thus recommended her for a promotion. (Id.) Despite this recommendation, plaintiff's application for promotion was rejected by the DSU Board of Trustees in the spring of 1986 because of the negative teaching evaluations in her file. (D.I. 75 at A40)

Plaintiff reapplied for promotion in the fall of 1986. On November 10, 1986, plaintiff filed an EEOC complaint against DSU alleging age and sex discrimination in connection with the denial of her 1985 application. (D.I. 75 at A41) On November 14, 1986, then-Department Chair Dr. James Hartnett ("Hartnett") and the Department Personnel Committee ("Personnel Committee") consisting of Flayhart, Gardner and Spina, recommended plaintiff for promotion to Associate Professor pursuant to her 1986 request. (D.I. 75 at A43) The Board of Trustees agreed and promoted plaintiff to Associate Professor beginning on September 1, 1987. (D.I. 75 at A44)

In July of 1987, plaintiff added the charge of race discrimination to her EEOC complaint, alleging that some of her black colleagues had received tenure or promotion even while having negative evaluations

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3

Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)

**(Cite as: 2000 WL 1481018 (D.Del.))**

in their files or not fulfilling the necessary requirements. (D.I. 75 at A46) On November 27, 1987, the EEOC issued its decision on the complaint, finding no evidence of discrimination surrounding the denial of plaintiff's 1985 request for promotion. [FN4] (D.I. 75 at A54) This decision was later upheld by the EEOC upon review. (D.I. 75 at A57)

> FN4. The EEOC found that during the same academic year, four others were considered for promotion: two black females over age 40 were promoted; one white male much younger than plaintiff was denied promotion for reasons of merit; and one white female under 40 was denied a promotion on technical grounds but was later granted the promotion on appeal. (D.I. 75 at A53-54)

C. Tenure Application, First Federal Lawsuit and Second EEOC Complaint

In the fall of 1987, plaintiff applied for tenure. The Personnel Committee recommended that plaintiff be denied tenure, as did Hartnett, who cited plaintiff's lack of organizational ability [FN5] and combative temperament. (D.I. 75 at A52) Similarly, the Tenure Committee voted not to recommend plaintiff for tenure because of deficiencies in teaching and scholarly publication. [FN6] (D.I. 75 at A58) In response, plaintiff submitted a lengthy statement to Tisdale, who was then Vice President and Dean of Academic Affairs, rebutting the negative evaluation by Hartnett. [FN7] (D.I. 75 at A60) On June 9, 1988, an Ad Hoc Appeals Committee of plaintiff's peers ("Appeals Committee") voted to uphold the Tenure Committee's decision not to recommend her for tenure. [FN8] (D.I. 75 at A76) On July 7, 1988, the DSU Board of Trustees rejected plaintiff's tenure application. (D.I. 75 at A77)

> FN5. Specifically, Hartnett referred to problems with students due to lack of communication and classroom organization, poor handling of the Internship Program, and failure to meet deadlines in administrative matters, such as

textbook orders and submission of course syllabi. (D.I. 75 at A51-52)

> FN6. The Tenure Committee specifically referred to Section 8.5.2a of the DSU Collective Bargaining Agreement ("CBA"), which states in part, "Competence in teaching is an absolute necessity for promotion or tenure," and Section 8.5.2b of the CBA, which states in part, "[P]ublication of scholarly books, monographs, and articles in publications recognized by and within the discipline ... are worthy of professional recognition." (D.I. 75 at A59)

> FN7. Plaintiff claimed that Hartnett directly contradicted his March 1987 chair evaluation, in which he gave plaintiff high scores in these areas. (D.I. 75 at A60)

> FN8. The Appeals Committee, however, noticed many "disturbing" administrative factors, including a lack of department leadership to make plaintiff formally aware of inadequacies, poor counseling to assist plaintiff in remedying any deficiencies, an unwillingness by the Personnel Committee to share its reasons for a negative recommendation, and a conflict between written and verbal recommendations by the chair and faculty. (D.I. 75 at A76)

*3 Meanwhile, on March 18, 1988, plaintiff filed a pro se lawsuit in federal court against DSU and several administrators and professors, claiming discrimination based on race, age and sex surrounding plaintiff's 1985 request for promotion. (D.I. 75 at A67) On February 2, 1989, plaintiff voluntarily withdrew the lawsuit. (D.I. 75 at A101) Plaintiff also filed a union grievance under the CBA regarding her denial of tenure. (D.I. 75 at A71)

In June 1988, plaintiff filed a second EEOC complaint, alleging that she was denied tenure in retaliation for filing her first EEOC complaint. (D.I. 75 at A78) The EEOC found this complaint also to be without merit. [FN9] (D.I. 75 at A79)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4

Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)

**(Cite as: 2000 WL 1481018 (D.Del.))**

FN9. The EEOC determined that during the year in which plaintiff applied for tenure, there were eleven applicants for tenure, and only three, all white females and two over the age of 40, were granted tenure. Those who did not get tenure included 4 blacks and 3 whites (including plaintiff), and ten of the eleven were over age 40. (D.I. 75 at A79)

On January 9, 1989, plaintiff wrote a letter to President DeLauder requesting an alternate evaluation panel due to the allegedly "prejudicial" nature of the Personnel Committee. (D.I. 75 at A84) Plaintiff requested guidance on how to remedy the situation of "silence" from the Dean, "inactivity" from the Chair, and "hostility" from the Personnel Committee. (D.I. 75 at A84) On March 21, 1989, the Personnel Committee's vote on whether to recommend plaintiff for reappointment resulted in a tie, but Department Chair Frederick Lauter supported reappointment so plaintiff remained on the faculty. [FN10] (D.I. 75 at A88)

FN10. Valle and Flayhart submitted negative evaluations, to which plaintiff offered rebuttal statements. Plaintiff characterized Valle's criticisms as conclusory, vague and in contradiction of good evaluations he gave her in prior years. (D.I. 75 at A90-93) Plaintiff also stated that her request for clarification from Valle was met with a repeat of the vague criticisms he already submitted. (D.I. 75 at A90) Plaintiff directly contradicted most of Flayhart's account of the class that he evaluated and attributed his criticisms to "the inappropriateness of having a historian assess the pedagogical and disciplinary substance of a political scientist's work." (D.I. 75 at A94)

D. Second Federal Lawsuit

In April 1989, plaintiff filed a second pro se lawsuit alleging discrimination in connection with the denial of her application for tenure. This lawsuit was dismissed in October of that year. (D.I. 75 at

A103) On November 3, 1989, DeLauder found that technical procedural violations occurred in plaintiff's tenure review, so he ordered the process to be repeated in the fall of 1990. [FN11] (D.I. 75 at A105) Plaintiff's Union appealed this decision to binding arbitration as provided for in the CBA, but subsequently withdrew its request for arbitration. (D.I. 75 at A107) Plaintiff reapplied for tenure in 1991 and received it in 1992. (D.I. 78 at B112)

FN11. DeLauder determined that the chairperson's evaluation was not provided in a timely fashion, the Tenure Committee chairperson did not notify plaintiff that the file was in the office and it contained negative comments, and the Department did not develop criteria for promotion or tenure prior to considering all applications that year. (D.I. 75 at A105)

E. Initial Applications for Promotion to Full Professor

In the fall of 1992, plaintiff applied for promotion to full professor. The Personnel Committee (Department Chair Valle, Flayhart and Professor Jean Smith) supported the application, as did the Tenure Committee. (D.I. 75 at A110-A111) However, neither the Acting Dean of the School of Arts and Sciences, Warren Rhodes, nor Tisdale recommended plaintiff for promotion. [FN12] (D.I. 75 at A112, A116) On March 21, 1994, plaintiff's request for promotion was rejected by DeLauder, who cited lack of an "outstanding record in both teaching and research." (D.I. 75 at A118)

FN12. Rhodes specifically cited plaintiff's deficiency in scholarly publication. (D.I. 75 at A112)

Plaintiff applied again for promotion in the fall of 1993 and was again recommended by the Personnel Committee. (D.I. 75 at A119) Flayhart disagreed because of deficiencies in research, stating that "[f]ailure to provide specific evidence of this has blocked consideration for promotion for other members of the faculty." (D.I. 75 at A120) Although the Appeals Committee recommended

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)

(Cite as: 2000 WL 1481018 (D.Del.))

promotion, the Tenure Committee, Tolliver and DeLauder agreed with Flayhart, and plaintiff was not promoted to professor that year. It was also at this time that Flayhart recommended plaintiff for an award for meritorious research for the 1992-93 academic year and, as a result, plaintiff was given a salary increase. (D.I. 75 at A122-A123)

*4 Plaintiff applied for promotion to full professor again in fall 1995. The Personnel Committee supported her promotion, [FN13] as did the Appeals Committee upon review, but the Tenure Committee, Flayhart, Tolliver, Taylor and DeLauder disagreed, once again citing a lack of outstanding research. (D.I.A128-A139) On May 21, 1996, Flayhart sent plaintiff a memo explaining his reasons for not recommending her, specifically, his view that the CBA requirement of outstanding research for promotion refers to articles that are already published, not articles that are merely accepted for publication, like those plaintiff cited in her application. (D.I. 75 at A135)

> FN13. The Personnel Committee lauded plaintiff's strengthening of the political science curriculum, especially as Pre-Law and Internship Coordinator, her "stimulating and challenging" teaching, her research that has led to "widespread professional recognition" and her "extensive" community involvement. (D.I. 75 at A128)

In June of 1995, plaintiff was awarded a parity salary increase, and on January 16, 1996, plaintiff was awarded professional development funds in support of her project, "Sexual Harassment in the Workplace." (D.I. 75 at A132, A138)

F. The Internship Program and Union Grievances

Since the fall of 1993, Flayhart periodically encouraged plaintiff to accelerate development of the Internship Program. (D.I. 75 at A140-A145) In particular, Flayhart requested plaintiff to place an intern in Senator Biden's Washington office, which she was unable to do because of the expense of living in Washington and time that the intern would

spend away from school. (D.I. 78 at B103) In the fall of 1995, Flayhart permitted a student who was the grandson of a former president of DSU to retroactively receive Internship Program credit for a summer internship, and plaintiff rejected this arrangement as against the policy of the Internship Program. (D.I. 75 at A146, D.I. 78 at B123) On November 28, 1995, Flayhart requested that all student files be submitted to him by the following day for review. (D.I. 75 at A147) Plaintiff failed to do this [FN14] and Flayhart removed her as director of the Internship Program on November 29, 1995. (D.I. 75 at A148)

> FN14. Plaintiff alleges that upon receipt of the request for the documents, she sought guidance from the DSU grievance officer, who suggested that plaintiff ask for clarification of Flayhart's request. Plaintiff claims she sent a memorandum to Flayhart, but was removed from her position the next day and never received a response. (D.I. 78 at B125)

Flayhart then requested plaintiff to provide him with all grades for students in the Internship Program, and plaintiff did so in a memorandum in which she addressed herself as "Internship Coordinator." (D.I. 75 at A150) On January 2, 1996, Flayhart sent a letter to the DSU Office of Records stating that he was the only professor authorized to enter grades for the Internship Program and that "illegal" grades had been recorded into the system by plaintiff. [FN15] (D.I. 75 at A152)

> FN15. According to Flayhart, plaintiff submitted grades for her students as well as students supervised by other professors. (D.I. 75 at A174) These grades were inconsistent with those she provided to Flayhart. (D.I. 75 at A155) Plaintiff alleges that other professors supervised interns while she was on sabbatical and would expect her to submit grades for those students when she returned. (D.I. 78 at B119-120)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 6

Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)

**(Cite as: 2000 WL 1481018 (D.Del.))**

In April 1996, plaintiff filed two union grievances over her removal as Internship Director and her claim that Flayhart substituted grades. These grievances were denied at both levels of review. (D.I. 75 at A158-159) In October of 1996, the Union's Executive Committee denied plaintiff's request to advance the grievances to arbitration. (D.I. 75 at A161)

G. Annual Reports, Student Complaints and Alleged Verbal Abuse

DSU publishes annual reports in which department chairs list the achievements and development of their academic programs and faculty. Plaintiff alleges that Flayhart included false statements in the Department's annual reports, including that plaintiff was very ill during the 1993-1994 academic year which resulted in many incomplete grades, cancellation of over one-third of her classes, and numerous student complaints. [FN16] (D.I. 78 at B301, B306) Flayhart also included that plaintiff was removed as Internship Director and resigned as Pre-Law Advisor, and characterized her grants and research from Queen's University in Ireland as not recognized by DSU. (D.I. 78 at B306, B310)

> FN16. In his deposition, Gardner states that he did not recall plaintiff having any more student complaints than her peers. (D.I. 78 at B57)

**\*5** Plaintiff also alleges that Flayhart publicly berated her on several occasions. For instance, plaintiff claims that Flayhart ordered her to alphabetize the law catalogs, a job she felt was appropriate for a student worker, scolded her for cancelling a field trip at which only one student showed up, and humiliated her during departmental meetings by criticizing her for raising issues for discussion. (D.I. 78 at B185, B193, B298) Plaintiff described Flayhart's "pattern of discrimination, harassment and deliberate interference with [her] professional responsibilities" in a letter to DeLauder on December 18, 1996. [FN17] (D.I. 78 at B431) These alleged events were also brought to the attention of Tolliver and the DSU Affirmative Action Officer, Drexel Ball. (D.I. 78 at B434, B453)

FN17. In addition to the aforementioned incidents, plaintiff described Flayhart's refusal to recommend her for merit pay two years in a row (while recommending her peers), improperly informing personnel of her sick days when she was not sick, forcing her to teach an overload of courses in order to accommodate his administrative error, scolding her in front of her students, refusing to meet with her to discuss his evaluations of her performance, demanding that she pay for incoming fax usage while not requiring her peers to do the same, and refusing to honor her requests for course preferences while doing so for other faculty members. (D.I. 78 at B431-432)

H. 1996 Request for Promotion to Full Professor

Plaintiff applied again for promotion to Professor in fall 1996. As part of the application process, classroom evaluations were performed by plaintiff's peers. Although the evaluations by Dr. Samuel Hoff ("Hoff") and Gardner were favorable, Flayhart gave the plaintiff very low scores and did not recommend her for tenure, promotion or reappointment on the faculty. (D.I. 75 at A164) This evaluation was never placed in plaintiff's tenure file. (D.I. 75 at A192)

On October 9, 1996, the Personnel Committee recommended plaintiff for promotion, but without notice of Flayhart's negative recommendation. (D.I. 78 at B381) On October 14, 1996, Flayhart wrote to both the Tenure Committee and Tolliver, recommending against promotion. (D.I. 75 at A183)

On October 16, 1996, Flayhart met with the Union to discuss pending grievances, and the next day he composed two letters--one to plaintiff and one to DeLauder--outlining his intention to seek plaintiff's dismissal. (D.I. 75 at A172, A175) After consultation with the DSU attorney, however, the letters were never sent. (D.I. 75 at A178)

On November 20, 1996, the Tenure Committee informed plaintiff that it had voted not to recommend her for promotion. (D.I. 75 at A191)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp 2d                                                              Page 7

Not Reported in F.Supp 2d, 2000 WL 1481018 (D.Del.)

**(Cite as: 2000 WL 1481018 (D.Del.))**

The Appeals Committee upheld the decision, and Tolliver agreed. (D.I. 75 at A193)

In late January 1997, DeLauder determined that certain procedural violations had occurred in plaintiff's 1996 promotion application process, [FN18] so he directed Flayhart to meet with plaintiff and review his classroom evaluation with her and then for the Tenure Committee to reconsider the matter. [FN19] (D.I. 75 at A196) On March 4, 1997, plaintiff and Flayhart met for 1.5 hours to discuss the evaluation pursuant to DeLauder's request, and plaintiff subsequently expressed her dissatisfaction with the meeting and the entire process to the Union President and DSU's Contract Administrator. (D.I. 75 at A218) On April 10, 1997, plaintiff provided the Tenure Committee with a lengthy rebuttal to Flayhart's evaluation, repeatedly stating that his criticisms lacked "specific, concrete details." (D.I. 75 at 219)

> FN18. The CBA violations included: Flayhart's failure to review the fall evaluation with plaintiff or provide her with a copy; Flayhart's failure to consult with plaintiff before making a negative recommendation; and failure of the Tenure Committee to inform plaintiff that she received a negative recommendation and to allow her to submit a rebuttal. (D.I. 75 at A196)

> FN19. Flayhart attributes not speaking to plaintiff to her request on April 1996 that he never speak to her again because he was the source of her work-related stress. (D.I. 75 at A192)

In response to plaintiff's objection to the reconsideration process, on September 30, 1997, the Union President advised plaintiff to either accept the process as is, or to appear directly before the DSU Board of Trustees. (D.I. 75 at A255) Plaintiff rejected both options and instead suggested recusal of those Tenure Committee members who were involved in the prior evaluations. (D.I. 75 at A265) The Union President rejected the suggestion of recusal without specific evidence of bias, and the

reconsideration process continued as before. (D.I. 75 at A267)

I. Events Leading to Dismissal

*6 On September 24, 1997, plaintiff removed two female students from her Introduction to Political Science class, allegedly due to their repeated disruptive behavior. The students were sent to counseling with Vice President of Student Affairs, Ms. Lowan Pitt ("Pitt"). The students were instructed to return to class on October 3, but when they did, plaintiff required them to make an apology and they refused. [FN20] After giving a quiz, plaintiff cancelled the remainder of the class. When class met again on October 6, plaintiff summoned a campus security officer and asked him to remove the two students, but he did not do so. The next day, plaintiff requested assistance from Tolliver in addressing the disciplinary problem because her "effort ... to resolve this problem through an informal process has failed" and she "fear[ed] for [her] own personal safety." (D.I. 78 at B471) Flayhart sent a memo requiring plaintiff to hold class, but when at least one of the two students arrived at the next class, she cancelled class again. (D.I. 75 at A269) Flayhart sent plaintiff another memo removing her from the class and reassigning it to Hoff. (D.I. 75 at A269) Plaintiff replied to Flayhart, challenging his authority to remove her as professor. [FN21] Flayhart wrote to Tolliver, then Acting Provost, recommending plaintiff's dismissal for cause. (D.I. 75 at A288) The class met again on October 10, 1997, and after plaintiff refused to leave the class, Flayhart directed a security officer to move the students to another classroom where Hoff continued teaching the class (D.I. 75 at A291)

> FN20. Plaintiff was under the mistaken impression that the students were required to apologize before returning to class as was the case with prior students whom she had removed from her class. This apparently was not the arrangement that Pitt made with the students here. (D.I. 75 at A296)

> FN21. Plaintiff informed Flayhart that she

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)

(Cite as: 2000 WL 1481018 (D.Del.))

Page 8

intended to continue teaching the class since he, as a department chair/administrator, did not have the authority to remove instructors from classes, and would continue to teach until she received "written notification from a University administrator to the contrary." (D.I. 78 B476-477)

On October 7, 1997, Flayhart sent a memorandum to DeLauder regarding plaintiff's alleged deterioration, stating that "beyond a shadow of a doubt ... the health of [the plaintiff] continues to deteriorate ... [The plaintiff] represents a 'clear and present danger' to the Delaware State University academic community." (D.I. 75 at A256) On October 16, 1997, Tolliver wrote a letter to DeLauder recommending McKay's immediate suspension from DSU pending a hearing before the Ad Hoc Dismissal Committee ("Dismissal Committee") composed of fellow professors from throughout the University. (D.I. 75 at A292) On October 17, 1997, DeLauder suspended plaintiff with pay, pending appearance before the Dismissal Committee. (D.I. 75 at A293)

On November 24, 1997, plaintiff filed a union grievance alleging a violation of academic freedom which was later denied. (D.I. 75 at A295-297) On April 29, 1998, plaintiff filed a complaint with the Delaware Department of Labor and the EEOC alleging race and gender discrimination surrounding her suspension. (D.I. 75 at A298) On August 27, 1999, she filed a supplemental complaint with the EEOC expanding her allegations to include claims under the ADEA and ADA. (D.I. 75 at A300)

The hearing before the Ad Hoc Dismissal Committee was conducted over a period of four days on March 22-24 and March 29, 1999. In January 2000, the Committee issued a 51-page opinion recommending that plaintiff be dismissed from employment. (D.I. 75 at A303) On March 16, 2000, the DSU Board of Trustees accepted the Ad Hoc Dismissal Committee's recommendation and dismissed plaintiff from the faculty. [FN22] (D.I. 75 at A349)

FN22. DeLauder stated in a deposition that plaintiff was the first tenured professor suspended or terminated during his presidency, which began in 1987. (D.I. 78 at B213) Plaintiff's brief cited letters documenting alleged incidents where other professors physically assaulted students or yelled threats of bodily harm at their peers and were not ultimately terminated. (D.I. 78 at B420-428)

III. STANDARD OF REVIEW

*7 A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial." ' Matsushita, 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9

Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)

**(Cite as: 2000 WL 1481018 (D.Del.))**

burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). With respect to summary judgment in discrimination cases, the court's role is " 'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." ' *Revis v. Slocomb Indus.,* 814 F.Supp. 1209, 1215 (D.Del.1993) (quoting *Hankins v. Temple Univ.,* 829 F.2d 437, 440 (3d Cir.1987)).

IV. DISCUSSION

As a preliminary matter, the court agrees that defendants Taylor and Tisdale were not served within 120 days of the filing of the complaint in this case, and dismisses them from this action pursuant to Federal Rule of Civil Procedure 4(m). [FN23]

> FN23. Federal Rule of Civil Procedure 4(m) provides that "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate procedure." To this date, plaintiff has neither served Tolliver and Tisdale nor requested additional time for service from the court.

A. Title VII Claims

Plaintiff alleges that defendant DSU [FN24] discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964.

> FN24. Although defendants argue, and plaintiff concedes, that there is no individual liability under Title VII,

plaintiff has brought her Title VII claims against only DSU, making this issue moot. *See Dici v. Commonwealth of Pa.,* 91 F.3d 542, 552 (3d Cir.1996) (holding that there is no individual liability under Title VII).

1. Race and Gender Discrimination [FN25]

> FN25. The anti-discrimination provision of Title VII provides: "It shall be an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

Claims of discrimination brought pursuant to Title VII are analyzed under a burden-shifting framework, the particulars of which depend on whether the suit is characterized as a "pretext" suit or a "mixed motives" suit. Since review of the record does not reveal any direct evidence of race or gender discrimination and plaintiff does not purport to assert such, the court will analyze plaintiff's discrimination claim using the burden-shifting framework for "pretext" suits set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981). *See Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir.1997).

**\*8** Under this framework, plaintiff must first establish a prima facie case of race or gender discrimination under Title VII. In order to state a case based on discrimination, plaintiff must prove: (1) that she is a member of a protected class; (2) that she suffered some form of adverse employment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 10

Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)

**(Cite as: 2000 WL 1481018 (D.Del.))**

action; and (3) that this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly-situated person not of the protected class is treated differently. *See Boykins v. Lucent Techs., Inc.,* 78 F.Supp.2d 402, 409 (E.D.Pa.2000) (citing *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 410 (3d Cir.1999)). The Third Circuit recognizes, however, that the elements of a prima facie case may vary depending on the facts and context of the particular situation. *See Pivirotto v. Innovative Sys. Inc.,* 191 F.3d 344, 352 (3d Cir.1999).

Once a plaintiff has established a prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802. If the defendant carries this burden, the presumption of discrimination drops from the case, and the plaintiff must "cast sufficient doubt" upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated. *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir.1996) (en banc). *See also Olson v. Gen. Elec. Astrospace,* 101 F.3d 947, 951-52 (3d Cir.1996) (citations omitted) (stating that a plaintiff can demonstrate "sufficient doubt" by showing "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence").

Defendant at bar concedes that plaintiff has established a prima facie case of discrimination regarding her disparate treatment on the job, her applications for promotion and tenure, and her dismissal from DSU. (D.I. 74 at 29) Thus, the burden shifts to defendant, who has cited "legitimate" reasons for its actions, including numerous student complaints, plaintiff's disorganized teaching methods, neglect of the Internship Program, lack of scholarly research, a combative temperament, and the dispute over allegedly disruptive students that ultimately led to plaintiff's suspension and dismissal from DSU. (D.I.75) Plaintiff has countered with evidence that casts doubt upon the legitimacy of these reasons.

For instance, plaintiff received merit awards for her research at the same times she was denied promotion and tenure for deficiencies in that area. (D.I. 75 at A122, A132, A138) At every request for promotion or tenure, plaintiff received contradicting evaluations from various DSU faculty and at least twice, technical procedural violations occurred during the review process. (D.I. 75 at A105, A196) Plaintiff also alleges that other tenured DSU professors committed more egregious behavior and were never terminated. (D.I. 78 at B420-428)

**\*9** The court concludes, therefore, that there exist genuine issues of material fact as to whether DSU disparately treated and terminated plaintiff because of her race or gender. Accordingly, the court shall deny defendants' motion for summary judgment as to the Title VII discrimination claims.

2. Retaliation [FN26]

> FN26. The anti-retaliation section of Title VII provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

Claims of retaliation brought pursuant to Title VII are analyzed under the same burden-shifting framework described above. In the present case, plaintiff has presented only indirect evidence of retaliation, thus, the *McDonnell-Douglas* pretext framework applies.

As with a discrimination claim, a plaintiff claiming retaliation must first establish a prima facie case for retaliation under Title VII. In order to do so, a plaintiff must demonstrate by a preponderance of the evidence: (1) that she engaged in protected activity; [FN27] (2) that the defendant took adverse employment action against her; and (3) that a causal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 11

Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)

**(Cite as: 2000 WL 1481018 (D.Del.))**

link exists between the protected activity and the adverse action. *See Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir.1999). Once a plaintiff has established a prima facie case, the burden shifts to the defendant to "clearly set forth through the introduction of admissible evidence" reasons for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the motivating force behind the adverse employment action. *Burdine*, 450 U.S. at 254-55. If the defendant successfully rebuts the plaintiff's prima facie showing, the presumption of discrimination drops from the case, and plaintiff must present sufficient evidence for a reasonable factfinder to conclude "that the proffered reason was not the true reason for the employment decision." *Id.* at 256. *See also Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir.1997) ("The plaintiff must produce evidence from which a reasonable factfinder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination.").

> FN27. Title VII defines a "protected activity" as an instance when an employee has "opposed any practice made an unlawful employment practice by this subchapter, or ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

In the instant action, defendant argues that plaintiff has not established a prima facie case of retaliation because she did not engage in any protected activity after the late 1980s, nor has she established a link between the protected activity and defendant's adverse employment action. (D.I. 74 at 29- 30) On the contrary, the record indicates that plaintiff filed union grievances, an EEOC charge, a complaint with the Delaware Department of Labor, and various informal complaints in the late 1990s (D.I.75) Furthermore, plaintiff has sufficiently stated a causal link between her protected activities and her termination by DSU. According to the Third Circuit, this causal link is "not limited to

timing and demonstrative proof, such as actual antagonistic conduct or animus. Rather, it can be other evidence gleaned from the record as a whole from which causation can be inferred." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir.2000). Plaintiff alleges numerous instances of harassment, procedural violations and inconsistent evaluations by defendant after she filed her various complaints; therefore, a causal link can reasonably be inferred. Plaintiff has sufficiently stated a prima facie case of retaliation.

*\*10 The remaining analysis is similar to that of Title VII race and gender discrimination as stated above. The court concludes that there is sufficient evidence for a reasonable jury to find that the proffered reason for discharge was pretextual and that retaliation was the real reason for plaintiff's dismissal. Defendants' motion for summary judgment on the Title VII retaliation claim is denied.

B. Sections 1981, 1983, 1985 and Civil Conspiracy Claims

As an initial matter, the Eleventh Amendment limits the following claims against states and state officials to prospective injunctive relief. *See Edelman v. Jordan*, 415 U.S. 651 (1974). Since DSU is a state institution, [FN28] the following claims against DSU and defendants in their official capacities are limited to prospective injunctive relief.

> FN28. DSU is a corporation created and funded by the Delaware General Assembly, whose Board of Trustees is appointed by and includes the Governor. *See* Del.Code Ann. tit. 14, § 6501, *et seq.* Thus, DSU is an instrumentality of the State of Delaware for 11th Amendment purposes. *See also Chapman v. Trs. of Del. State Coll.*, 101 F.Supp. 441, 444 (D.Del.1951) (dismissing complaint because "a Federal Court should not interfere with The Trustees of Delaware State College, a state agency, which is a body corporate of the State of Delaware"); *Lewis v. Del. State Coll.*, 455 F.Supp. 239,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)

**(Cite as: 2000 WL 1481018 (D.Del.))**

245 (D.Del.1978) (Delaware State College's personnel decisions "constituted state action within the meaning of the Fourteenth Amendment" to the United States Constitution).

## 1. Section 1981 Claim

Section 1981 prohibits race-based discrimination in the making and enforcement of contracts. [FN29] Claimants are required to prove intentional discrimination under the same burden-shifting framework used in Title VII cases. Therefore, plaintiff must first establish a prima facie case of discrimination by demonstrating that: (1) plaintiff is a member of a racial minority; (2) defendants intended to discriminate against plaintiff on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in Section 1981. *See Lewis v. J.C. Penney Co.,* 948 F.Supp. 367, 371 (D.Del.1996). Upon a prima facie showing by plaintiff, the burden shifts to defendants to assert a "legitimate, nondiscriminatory" reason for their actions, which plaintiff may rebut with evidence of pretext. *See McDonnell Douglas,* 411 U.S. at 802.

FN29. Section 1981, as amended by the Civil Rights Act of 1991, provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). The coverage of the statute "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b) These rights are protected from encroachment by both private and state actors. *See* 42 U.S.C. § 1981(c).

As a member of a racial minority at a predominantly African-American university, plaintiff satisfies the first prong of the prima facie case. In order to show intentional discrimination under the second prong, plaintiff "must point to facts of record which, if proved, would 'establish that defendants' actions were racially motivated and intentionally discriminatory,' or, at least, 'support an inference that defendants intentionally and purposefully discriminated' against her on the basis of her race." *Ackaa v. Tommy Hilfiger Co.,* No. 96-8262, 1998 WL 136522, at *3 (E.D.Pa. Mar. 24, 1998) (citations omitted). Plaintiff's allegations that her black colleagues were treated differently, combined with defendants' inconsistent reasons for their denials of promotion and tenure, sufficiently support an inference of intentional racial discrimination. Finally, plaintiff satisfies the third prong of the prima facie showing because defendants' alleged discrimination resulted in plaintiff's dismissal from her tenured position at DSU.

The remaining analysis is similar to that under Title VII, thus, the court denies defendants' motion for summary judgment with regard to plaintiff's Section 1981 claim.

## 2. Section 1983 Claims

Section 1983 imposes liability on any person who, under color of state law, deprives another of any rights secured by the Constitution or the laws of the United States. *See* 42 U.S.C. § 1983. Specifically, plaintiff asserts that defendants' discriminatory actions violated her rights under the First Amendment and Equal Protection Clause of the Fourteenth Amendment. (D.I. 20 at A16)

**\*11** As an initial matter, the Eleventh Amendment bars Section 1983 claims against state entities and state officials sued in their official capacities. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989). The court therefore grants summary judgment with respect to the Section 1983 claims against DSU and defendants in their official capacities.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 13

Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)

**(Cite as: 2000 WL 1481018 (D.Del.))**

As for the claims against defendants in their individual capacities, the test for discriminatory intent under Section 1983 is the same as that under Title VII. *See Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir.1997) (citation omitted). The court finds that there exist genuine issues of material fact as to whether defendants unconstitutionally discriminated against plaintiff so as to deprive her of her Fourteenth Amendment right to equal protection. Similarly, there is a genuine dispute as to whether defendants deprived plaintiff of her First Amendment right to petition by interfering with her right to file lawsuits and other grievances against defendants. Therefore, summary judgment is denied with respect to plaintiff's Section 1983 claims against defendants in their individual capacities.

3. Section 1985 and Civil Conspiracy Claims [FN30]

> FN30. Plaintiff asserts a claim under 42 U.S.C. § 1985 and a separate "civil conspiracy" claim which the parties later characterize in their briefs as pursuant to Sections 1983 and 1985. For efficiency purposes, the court considers these claims together.

Defendants argue that plaintiff has insufficiently pled her conspiracy claims and, therefore, they should be dismissed. To plead a cognizable Section 1985(3) claim, a plaintiff must allege facts to show a conspiracy for the purpose of depriving a person or class of persons of equal protection of the laws or equal privileges and immunities, and an act in furtherance of the conspiracy whereby a party is injured in his person or property or is deprived of a right or privilege of a citizen of the United States. *See United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 829 (1983). Section 1985(3) prohibits only conspiracies predicated on "racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

In her complaint, plaintiff alleges that defendants perpetrated an unlawful scheme to "fabricate false

claims and poor teaching against [her];  dismiss [her] due to her reporting the harassment by defendants; and ... terminate [her] in retaliation for having opposed defendants' practice of harassment." (D.I. 20 at A19). To support these claims, plaintiff states that her requests for review of her denial of promotion were ignored by several of the defendants, that the many enumerated instances of harassment by Flayhart were "administratively sanctioned," and that the acts of retaliation against her were "known, authorized, and approved by ... DeLauder, Tisdale, Taylor, Tolliver and Flayhart." (D.I. 20 at A7-9). In alleging the various instances of harassment by Flayhart and the indifference of the DSU administration that ultimately led to her termination, plaintiff's complaint sufficiently states a claim for conspiracy under Section 1985(3). The court, therefore, denies summary judgment with respect to plaintiff's conspiracy claims.

C. Eleventh Amendment Immunity Against the ADEA and ADA Claims [FN31]

> FN31. Although the parties argue the merits of an Eleventh Amendment bar of the ADA claim, the court finds no such claim in the Complaint or Amended Complaint. Since both parties address the issue in their briefs, the court will address it as well.

*12 Plaintiff has conceded that her claims under the ADEA are barred by the Eleventh Amendment pursuant to the Supreme Court's decision in *Kimel v. Florida Board of Regents,* 120 S.Ct. 621 (2000). Although the issue of whether claims under the ADA against a state entity are barred by the Eleventh Amendment was not directly addressed by the Supreme Court, the Third Circuit has recently decided that they are so barred. *See Lavia v. Pennsylvania Dept. of Corrections,* No. 99-3863, 2000 WL 1121553, at *11 (3d Cir. Aug. 8, 2000) (holding that Congress did not abrogate states' Eleventh Amendment sovereign immunity when enacting the ADA). Therefore, the court grants defendants' motion for summary judgment with respect to both the ADEA and the ADA claims. [FN32]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 14

Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)

**(Cite as: 2000 WL 1481018 (D.Del.))**

FN32. Plaintiff has conceded that there is no individual liability under the ADEA or the ADA. These claims are also barred against defendants in their official capacities pursuant to the Eleventh Amendment. *See Hafer v. Melo,* 502 U.S. 21, 26 (1991) (holding that when state official is sued in official capacity, real party in interest is government entity of which official is an agent).

D. State Law Claims

Plaintiff also alleges state law claims of discrimination based on race, gender and age in violation of the Delaware Discrimination in Employment Act, Del.Code Ann. tit. 19, § 710, *et seq.,* violation of the Delaware Constitution, [FN33] and common law breach of contract. Pendent state law claims against state entities and officers are barred by the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106 (1984). Plaintiff may still bring these claims against defendants in their individual capacities, however. *See Lloyd v. Mich. Dep't of State Police,* 53 F.Supp.2d 643, 680 (D.Del.1999) (holding that Eleventh Amendment sovereign immunity is no defense to state law claims brought against state officials in their individual capacities). Therefore, the court grants summary judgment as to plaintiff's state law claims against DSU and the remaining defendants in their official capacities.

FN33. Plaintiff mistakenly alleges a violation of Article XVI, Section 10 of the Delaware Constitution, which is a non-existent provision. The court assumes that plaintiff is alleging a violation of Article XV, Section 10, which provides, "No citizen of the State of Delaware shall be disqualified to hold and enjoy any office, or public trust, under the laws of this State, by reason of sex."

E. Statute of Limitations

Defendants argue that several of plaintiff's claims are barred by their respective statutes of limitations.

[FN34] Although defendants are technically correct, the Third Circuit recognizes a continuing violation exception to the timely filing requirement. *See West v. Phila. Elec. Co.,* 45 F.3d 744, 754 (3d Cir.1995). Under this exception, a plaintiff may pursue a discrimination claim for "conduct that began prior to the filing period if [plaintiff] can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *Id.* "To successfully argue a continuing violation theory, the plaintiff will have to show a present violation, i.e., one within the statute of limitations period, that is reasonably related to previous discriminatory acts that, standing alone, would be barred by the statute of limitations." *Cuffy v. Getty Ref. & Mktg. Co.,* 648 F.Supp. 802, 810 (D.Del.1986).

FN34. Defendants argue that certain of plaintiff's claims arising under Sections 1981 and 1983, Delaware's Discrimination in Employment Act, and Title VII are barred by their statutes of limitations. (D.I. 74 at 35) Specifically, defendants contend that plaintiff's claims based on her failure to be promoted to full professor in 1993, 1994, 1995 and 1996, as well as her failure to receive merit pay in 1995 and 1996, are time-barred. (*Id.*)

Plaintiff's termination on March 16, 2000 falls within the statute of limitations. That decision was based on a 51-page report by the DSU Ad Hoc Dismissal Committee that discussed plaintiff's entire fourteen-year history at DSU. (D.I. 75 at A349) Moreover, at every denial of promotion or tenure, defendants have cited the same reasons for their decisions. It is fair to say that plaintiff's alleged disparate treatment was continuous and ongoing during her employment at DSU. The court concludes that plaintiff's claims are sufficient to constitute a "pattern of discrimination" and are not barred by any statute of limitations.

V. CONCLUSION

**\*13** For the reasons stated, defendants' motion for summary judgment is denied in part and granted in part. An appropriate order shall issue.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 15

Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)

**(Cite as: 2000 WL 1481018 (D.Del.))**


Not Reported in F.Supp.2d, 2000 WL 1481018
(D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 549531 (D.Del.)

(Cite as: 2005 WL 549531 (D.Del.))

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
John MILLER, Plaintiff,
v.
TOWN OF MILTON, Defendant.
**No. Civ. 03-876-SLR.**

March 8, 2005.

Jeffrey K. Martin, and Timothy J. Wilson, of Margolis Edelstein, Wilmington, Delaware, for Plaintiff.

Norman H. Brooks, Jr., and Joseph M. Leager, Jr., of Marks, O'Neill, O'Brien & Courtney, Wilmington, Delaware, for Defendant.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

**\*1** On September 11, 2003, plaintiff John Miller filed this suit against defendant the Town of Milton ("defendant" or "the Town") alleging racial discrimination and retaliation in violation of 42 U.S.C. § 1981 (" § 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* as amended by the Civil Rights Act of 1991, 42 U.S.C. § 704(a) ("Title VII"), and the Milton town charter ("the Charter").

On July 12, 2001, plaintiff filed a complaint with the Delaware Department of Labor ("DDOL") challenging defendant's failure to promote him to the position of Chief of Police. (D.I. 39 at 9) The DDOL concluded that plaintiff had been

discriminated against based on his race, finding that there was "credible evidence ... that some Council Members worked to keep [plaintiff] from the position ..." (Id. at 12-13) The EEOC found that "the evidence obtained during the [DDOL] investigation establishes a violation of Title VII ." ( Id. at 7) In light of the EEOC's findings, and lack of settlement during the conciliation period, the EEOC issued a right to sue letter. (Id. at 8)

The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and 1343(a)(4). Currently before the court are the parties' cross motions for summary judgment. (D.I.37, 40) For the reasons stated, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted in part and denied in part.

II. BACKGROUND [FN1]

> FN1. Throughout his filings in conjunction with the summary judgment motions, plaintiff cites to his complaint as support for his assertions, apparently relying on the argument that, because his requests for admissions went unanswered by defendant, defendant admitted the assertions. (See, e.g., D.I. 41 at 12) This argument is without merit, however, in light of the court's December 10, 2004 order excluding plaintiff's requests for admissions as filed after the close of discovery. (D.I.53) Therefore, the court treats plaintiff's statements, cited to the complaint, as unsubstantiated assertions and does not restate or rely on them for purposes of these proceedings.

In September of 1988, the Town hired plaintiff as a part-time police officer. (D.I. 41 at 5) In 1990 he was a given a full-time position as a Patrolman First Class. (Id.) In 1992, plaintiff was promoted to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 549531 (D.Del.)

(Cite as: 2005 WL 549531 (D.Del.))

Page 2

Sergeant. (*Id.*) Three years later, in 1995, plaintiff was promoted to Assistant Chief of Police, a position that was second in command to the Chief of Police. (*Id.*) As the Assistant Chief of Police, plaintiff, inter alia, helped the Chief with the annual budget, a responsibility that was within the Chief of Police's job description. (D.I. 42 at A0062) Plaintiff's job performance was never deemed unsatisfactory. (D.I. 42 at A0039)

In April of 1996, Jack Bushey became the Mayor of Milton. On the same day Mayor Bushey was sworn in, plaintiff was "demoted" from Assistant Chief of Police to Lieutenant, without notice, reason or warning. (D.I. 41 at 5) When plaintiff subsequently applied for additional police training, he was denied the opportunity, even when he offered to pay for the training. (D.I. 41 at 6-7)

On April 30, 2001, the Chief of Police retired, creating a vacant position. Section 2-20(g)(1) of the Charter provides that "[a]ny employee of the Town wishing to be considered for a promotion to a vacant position shall request the Personnel Officer to include his file with an application for the position to be considered for eligibility...." (D.I. 42 at A0079) The Charter further requires that "[t]he hiring of the position[ ] of Police Chief ... shall be with the majority approval of Mayor and Council." (D.I. 42 at A0079) Section 2-20(c)(5) of the Charter provides that recruiting shall be designated as either "promotional recruiting" or as "open, competitive recruiting." In "open, competitive recruiting", all eligible candidates, including Town employees, are considered. In "promotional recruiting", only employees of the Town are considered. In this regard,

*2 [a]t the discretion of the Personnel Officer, and with the approval of Council, advertisement may not be used for the purposes of recruiting if the following is met: there is at least one (1) person who is already employed by the Town who wishes to be considered for the vacant position and for whom the vacant position represents a logical promotion from the position currently held; or if in the opinion of the Personnel Officer, a condition exists which requires that such employee be hired immediately

in order to avoid a serious disruption of the services provided by the Town.
Section 2-20(c)(4)(emphasis added). (D.I. 42 at A0077-78)

Upon the Chief's retirement, plaintiff was named "Officer-in-Charge" and served in that capacity until the installation of a new Chief. Plaintiff requested the Town Clerk to include his file for the Chief of Police position. Plaintiff was told that he would have to submit a new application and undergo a background check. (D.I. 41 at 8) Initially, plaintiff refused to undergo an additional background check because "none of his white predecessors had been required" to. (D.I. 41 at 8) On advice of counsel, however, plaintiff submitted to the background check so that his application would be considered for the vacant position. (*Id.*)

The Milton Town Council ("the Council"), through its Personnel Committee, determined to conduct "open, competitive recruiting." (*Id.*) Councilman Blayney, a member of the Personnel Committee, stated that this decision was based on the growth anticipated by the Town which would make the Chief of Police an important position requiring leadership. (*Id.* at A31) Before acting, the Council asked the Town Solicitor to determine whether the Charter required them to hire an employee for the position. The Solicitor advised that the Council "had all the backing of the law to seek candidacy outside of the town employment force...." (*Id.* at A35)

Having decided to conduct open recruiting for the position of Chief of Police, defendant contacted the Town of Georgetown, which had just gone through a similar hiring process. (*Id.* at A27) The Town of Georgetown recommended that defendant use the services of the Delaware Police Chief's Council ("DPCC") because Georgetown had used the DPCC's selection process in selecting its chief of police. (*Id.*) Initially, the Council used the DPCC to aid in its hiring decision but, upon learning that the president of the DPCC was an applicant for the position, the Council switched to the Maryland Police Chief's Council ("MPCC"). (*Id.* at A40-41) The MPCC then performed interviews and an initial

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2005 WL 549531 (D.Del.)

(Cite as: 2005 WL 549531 (D.Del.))

Page 3

screening of the candidates. (*Id.* at A41) The MPCC recommended three candidates for the Personnel Committee to present to the Council. (*Id.*) Plaintiff was not one of the final three candidates recommended by the MPCC. (*Id.*) Out of the six candidates interviewed by the MPCC, plaintiff received the lowest score. (D.I. 39 at A72-115)

**\*3** In response to the Council's meetings and actions regarding the Chief of Police position, Councilman Hunsicker resigned from the Council after serving only one and half years of his three year term. (D.I. 42 at A0049-A0058) According to Councilman Hunsicker, the title of "Officer-in-Charge" given to plaintiff (rather than "Acting Chief of Police") reflected Mayor Bushey's reluctance to promote plaintiff to the position of Chief of Police; i.e., that the title "Acting Chief" would infer that a promotion to "Chief" would be "a logical promotion" for plaintiff "from the position currently held," consistent with § 2-20(c)(4) of the Charter. (D.I. 30 at A14-15; D.I. 42 at A0077) Moreover, the Council failed to publicly recognize or record the letters submitted in support of plaintiff's candidacy. (D.I. 42 at A0053-56, A0067-75) Councilman Hunsicker also charged that Mayor Bushey did not want a "black Chief of Police" and was instrumental in convincing the Council to "hire out" the position. (D.I. 39 at A15-16; D.I. 42 at A0057) Consistent with that charge, Mayor Bushey was heard to remark, as part of a conversation regarding whether plaintiff would be the next Chief of Police, "that n ----- will never be chief as long as I have anything to do with it." (D.I. 42 at A0037; see also D.I. 41 at 6) Although Mayor Bushey denied making such a statement, he admitted using such derogatory racial slurs because he does not think "n -----" is a "strong word." (*Id.* at A0040-42) At Council meetings, particularly in private sessions, Mayor Bushey and Councilwoman Betts exchanged disparaging remarks about African American youth "loitering" on city streets. (*Id.* at A-0048-50)

In December of 2001, William Phillips, a Caucasian male, was hired as the new Chief of Police. On December 3, 2001, plaintiff resigned from his position at the Milton Police Department.

(D.I. 38 at 4; D.I. 42 at A0021)

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

### IV. DISCUSSION

A. Municipality Immunity From Suit Under § 1981

**\*4** Defendant argues it is immune from liability

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 549531 (D.Del.)

**(Cite as: 2005 WL 549531 (D.Del.))**

Page 4

under § 1981 because, as a municipal actor, it can only be sued under § 1983. In *Jett v. Dallas Independent School District,* 491 U.S. 701, 711-36 (1989), the Supreme Court held that § 1983 was "the exclusive federal damages remedy for the violation of rights guaranteed by § 1981 when the claim is pressed against a state actor. Thus to prevail on [a] claim for damages ... [a plaintiff] must show that the violation of his [rights] protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases." *Id.* at 736-36. The Court found that the legislative history of § 1983 and § 1981 indicated that Congress did not intend to make municipalities vicariously liable for discrimination. *Id.* at 725-31.

In 1991, Congress amended § 1981 by adding subsection (c), which increased the scope of the statute to "protect [the rights listed in the section] against impairment by nongovernmental discrimination and impairment under color of State law." Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071. Federal courts are divided on the effect the amendments had on discrimination claims brought against municipalities under § 1981. *Compare, Federation of African Am. Contractors v. City of Oakland,* 96 F.3d 1204 (9th Cir.1996) (finding that the 1991 amendments created an implied right of action under § 1981, but that the "custom or policy" requirement of *Monell* still applied), *with Oden v. Oktibbeha County,* 246 F.3d 458 (5th Cir.2001), *cert. denied,* 534 U.S. 948 (2001) (finding that the 1991 amendments did not create an implied right of action under § 1981 against state actors). [FN2]

> FN2. Although the effect of the 1991 amendments has not specifically been addressed by the Third Circuit, the circuit recently subjected a plaintiff's § 1981 claims to a *Monell* analysis, requiring him to prove a custom or policy of discrimination. *See Oaks v. City of Philadelphia,* No. 02-2772, 2003 WL 1228025 (3d Cir. March 17, 2003).

Assuming for purposes of these proceedings that the 1991 amendments created an implied right of

action under § 1981, the court concludes that plaintiff is required to prove defendant had a custom or policy of discriminating against African-Americans. [FN3] Therefore, defendant is not vicariously liable for discrimination by its agents and plaintiff must prove that there was a discriminatory policy implemented by a policy maker or "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity." *Oaks,* No. 02-2772, 2003 WL 1228025 at *1-*2 (citing *St Louis v. Praprotnik,* 485 U.S. 112, 123 (1988) and *Pembaur v. City of Cincinnati,* 475 U.S. 469, 485 (1986)). Plaintiff has failed to even assert, let alone demonstrate, that a policy maker authorized or acquiesced in a custom or policy of racial discrimination. The events that plaintiff claims were discriminatory are not sufficient for a reasonable jury to infer that defendant had a custom or policy of discriminating against African American employees generally.

> FN3. In amending § 1981, Congress inserted the phrase "under color of State law" into the subsection. This phrase is strikingly similar to the § 1983 language upon which the Supreme Court based on its holding in *Monell. See Monell v. Dep't of Social Serv. of City of New York,* 436 U.S. 658, 692 (1978) (holding that § 1983 "impose[d] liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights"). In light of the similarities, this court concludes that, even if Congress intended to imply a private right of action under § 1981, it incorporated into § 1981 all of the restrictions on § 1983 actions against municipalities. *See Federation of African Am. Contractors,* 96 F.3d at 1215.

**B. Retaliation in Violation of Title VII**

A plaintiff claiming retaliation must first establish a prima facie case under Title VII. [FN4] In order to do so, he must demonstrate by a preponderance of the evidence that: (1) he engaged in a protected

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2005 WL 549531 (D Del )

**(Cite as: 2005 WL 549531 (D.Del.))**

Page 5

activity; [FN5] (2) the defendant took adverse employment action against him; and (3) a causal link exists between the protected activity and the adverse action *See Kachmar v. Sungard Data Sys , Inc.,* 109 F.3d 173, 177 (3d Cir 1999) Once a plaintiff has established a prima facie case, the defendant gets the opportunity to set forth, through the introduction of admissible evidence, reasons for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the motivating force behind the adverse employment action *See Tex Dep't of Cnty. Affairs v. Burdine,* 450 U S. 248, 254-55 (1981). If the defendant successfully rebuts the plaintiff's prima facie showing, the presumption of discrimination drops from the case, and plaintiff must present sufficient evidence for a reasonable factfinder to conclude "that the proffered reason was not the true reason for the employment decision " *Id* at 256; *see also Bray v. Marriott Hotels,* 110 F.3d 986, 990 (3d Cir 1997)

> FN4. The anti-retaliation section of Title VII provides:
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
> 42 U S C. § 2000e-3a.

> FN5 Title VII defines a "protected activity" as an instance when an employee has
> opposed any practice made an unlawful employment practice by this subchapter, or
> ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
> 42 U S C. § 2000e-3(a)

1. Protected Activity

*5 Plaintiff argues that he engaged in protected activities when he complained that: (1) his title was changed from "Assistant Chief of Police" to "Lieutenant;" (2) he was denied training opportunities; and (3) he was asked to submit to a background check as part of his application. Protected activities include charges of discrimination or complaints about discriminatory employment practices. *See Abramson v. William Paterson Coll. of N J.,* 260 F.3d 265, 287-88 (3d Cir 2001).

In this case, plaintiff has not met his burden of establishing protected activity with respect to his complaints about the change in his job title and about being denied training. There is no evidence of record identifying the individuals to whom plaintiff complained, or what he said, or even if he complained at all. Based on the lack of evidence, a reasonable jury could not find that plaintiff opposed an unlawful employment practice under 42 U S.C. § 2000e-3(a).

A reasonable jury could infer, however, that plaintiff's refusal to undergo a background check was a protected activity. His refusal stemmed from his belief that his predecessors, all Caucasian, did not have to undergo additional background checks. In other words, he was forced to submit to a background check because he was African American. A reasonable jury could conclude that he was complaining about racial discrimination.

2. Adverse Employment Action

Plaintiff argues that he was denied the promotion to Chief of Police in retaliation for his complaints. The Third Circuit requires that an employment decision be a "materially adverse" employment decision before it will be considered retaliation. *See Lex K. Larson, Employment Discrimination* § 34.04 (2004) (citing *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir 1997)). The court finds that the denial of a promotion is a materially adverse employment action.

3. Causal Link

© 2005 Thomson/West. No Claim to Orig. U S Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 549531 (D.Del.)

(Cite as: 2005 WL 549531 (D.Del.))

Page 6

Plaintiff argues there is a causal link between his complaint about the second background check and being denied the promotion because he was denied the promotion after he complained. (D.I. 41 at 16) An inference of a causal link should be based on the evidence as a whole. *Kacmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir.1997). "[T]he mere fact that [an] adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy plaintiff's burden of demonstrating a causal link between the two events." *Robinson*, 120 F.3d at 1302. However, temporal proximity is some evidence of a causal link between two events. *See, e.g., Kacmar*, 109 F.3d at 177.

Defendant's failure to promote plaintiff was the result of two decisions: 1) The decision to conduct open, competitive recruiting for the position of Chief of Police; and 2) MPCC's decision not to recommend plaintiff for the position. Plaintiff has failed to carry his burden of establishing a causal connection between his refusal to undergo a background check and either of these decisions. There is no evidence of record from which a jury could infer that the MPCC decision had anything to do with plaintiff's refusal. Furthermore, based on the evidence of record, the court cannot determine which event occurred first, the Council's decision to conduct open recruiting or plaintiff's refusal to submit to a background check. Without knowing which came first, a reasonable jury could not conclude that plaintiff's refusal to submit to a background check caused the Council to retaliate against him. Therefore, defendant's motion for summary judgment is granted with respect to plaintiff's retaliation claims.

C. Racial Discrimination in Violation of Title VII

*6 Claims brought pursuant to Title VII are analyzed under a burden-shifting framework. Under this framework, plaintiff must first establish a prima facie case of race discrimination under Title VII. In order to state a case based on discrimination, plaintiff must prove that: (1) he is a member of a protected class; (2) he suffered some form of adverse employment action; and (3) this action

occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly situated person not of the protected class is treated differently. *See Boykins v. Lucent Techs., Inc.*, 78 F.Supp.2d 402, 409 (E.D.Pa.2000) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir.1999)). The Third Circuit recognizes, however, that the elements of a prima facie case may vary depending on the facts and context of the particular situation. *See Pivirotto v. Innovative Sys. Inc.*, 191 F.3d 344, 352 (3d Cir.1999).

If plaintiff makes a prima facie showing of discrimination, the burden shifts to defendant to establish a legitimate, nondiscriminatory reason for its actions. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If defendant carries this burden, the presumption of discrimination drops from the case, and plaintiff must "cast sufficient doubt" upon defendant's proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated. *See Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir.1996) (en banc).

In this case, it is undisputed that plaintiff is a member of a protected class, as he is African American. Plaintiff claims that he suffered some form of adverse employment action when: (1) he was "demoted" from Assistant Chief of Police to Lieutenant; (2) he was denied training; (3) he was assigned extra duties as the "Officer-in-Charge;" (4) he was forced to submit to a background check as part of his application for Chief of Police; (5) as the "Officer-in-Charge" he was required to report to both the Mayor and Town Clerk, whereas, his predecessors only had to report to the Mayor; and (6) he was denied a promotion. [FN6] (D.I. 41 at 17-18) Finally, plaintiff refers to evidence in the record that gives rise to an inference of racial discrimination. A Caucasian who was not a Town employee was given the position of Chief of Police. The Mayor of Milton used racially derogatory language with respect to African Americans and specifically with respect to plaintiff becoming Chief of Police. Certain Council members expressed animus towards African Americans. Councilman

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 549531 (D.Del.)

(Cite as: 2005 WL 549531 (D.Del.))

Page 7

Hunsicker opined that the failure to promote plaintiff was discriminatory.

> FN6. Plaintiff also alleges he was subject to adverse employment action because "he was followed around town by the Mayor." (D.I. 41 at 18) Taking all of the facts in the light most favorable to plaintiff, there is no evidence of record that he was followed by the Mayor; therefore, no reasonable jury could conclude this was an adverse employment action.

Defendant argues in response that it relied on the MPCC to recommend someone to fill the Chief of Police position and that the decision to hire out the position was based on the importance of the position in light of the future growth of Milton. Defendant further asserts that its decision to hire out the position was not discriminatory as evidenced by the fact that plaintiff and another African American were able to compete in the recruitment process. (D.I. 38 at 25)

*7 Although there is no evidence of record that the MPCC discriminated against plaintiff, it is not clear whether the Council's initial choice to conduct open recruiting for the position was motivated by plaintiff's race. There were numerous letters sent to the Council in support of plaintiff's promotion to Chief of Police and there were Council members who thought he was qualified for the position; even Mayor Bushey thought his service as a police officer was "satisfactory." (D.I. 42 at A0039) Judging from the evidence presented in the motions for summary judgment, it is not possible to determine what the motivating factor was behind the Council's decision to hire out; therefore, the motions for summary judgment are denied with respect to plaintiff's Title VII claims of racial discrimination.

D. Violations of the Charter

Plaintiff claims that defendant violated the Charter when it: (1) discriminated against him based on his race, in violation of § 2-20(b) of the Charter; [FN7] (2) conducted open and competitive recruiting

instead of promotional recruiting, in violation of § 2-20(c)(4) of the Charter; (3) required him to submit to a background check, in violation of § 2-20(g)(1) of the Charter; [FN8] (4) denied him the training he requested, in violation of § 2-24 of the Charter; [FN9] and (5) "demoted" him from Assistant Chief of Police to Lieutenant, in violation of § 2-25(l) of the Charter. [FN10] Defendant claims that the acts plaintiff challenges were discretionary under the Charter and, therefore, defendant is immune from suit.

> FN7. Section 2-20(b) of the Charter provides that "[t]here shall be no discrimination, against any person seeking employment or employed, because of ... race...." (D.I. 42 at A0078)

> FN8. Section 2-20(g)(1) provides that "[a]ny employee of the Town wishing to be considered for promotion to a vacant position shall request the Personnel Officer to include his file with an application for the position to be considered for eligibility...." (D.I. 42 at A0079) Section 2-21(b) of the Charter also provides that an application for employment "shall require of a candidate only that information necessary to establish name, address, telephone number, person to contact in emergency, references and qualification criteria as established for the position. The application shall not require information that does not meet the test of job relatedness nor any information of a discriminatory nature." (Id.)
> (Id., Sec. 2-21(b))

> FN9. With respect to training, § 2-24 provides:
> (a) The Personnel Officer may encourage the improving of service by providing employees with appropriate training programs....
> (b) Training programs may be made available in order to ...
> (1) Provide an employee with skill and knowledge required to achieve optimum

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 549531 (D.Del.)

(Cite as: 2005 WL 549531 (D.Del.))

performance in his current position.
(2) Acquaint an employee with rules, regulations, ordinances, policies, practices, and standards of Town service. (3) Provide an employee with appropriate training to develop potential skills and knowledge required for a position to which he may desire to advance.
(D.I. 42 at A0080)

FN10. Section 2-25(l) of the charter allows a permanent employee to be demoted "to a position of a lower grade or rank for the following reasons:"
(a) When an employee would otherwise be laid off because of lack of funding or his/her position is being abolished; his/her position is being reclassified to a lower pay grade; lack of work; or because of the return to work from authorized leave of absence of another employee to such a position.
(b) When an employee voluntarily requests such demotion.
(c) As a disciplinary action.
(D.I. 42 at A0081)

Delaware law provides immunity to "all governmental entities" for damage resulting from "[t]he performance or failure to exercise or perform a discretionary function or duty, whether or not the discretion be abused and whether or not the statute, charter, ordinance, order, resolution, regulation or resolve under which the discretionary function or duty is performed is valid or invalid." 10 Del. C. § 4011(a), (b)(3) (2004). As interpreted by the Delaware Supreme Court, the statute does not grant immunity in "every circumstance in which some element of choice is involved." *Sussex County v. Morris,* 610 A.2d 1354, 1358-59 (Del.1992). Acts that are "ministerial," " 'involv[ing] less in the way of personal decision or judgment or the matter for which judgment is required has little bearing of importance upon the validity of the act," ' are not granted immunity by § 4011(b)(3). *Id.* (citing Restatement 2d of Torts § 895D cmt. H (1979)).

With respect to plaintiff's argument that defendant

violated the Charter by discriminating against him, the court finds that this provision is not discretionary; therefore, the municipality is not immune for violations of § 2- 20(b). Likewise, defendant is not immune from liability for violations of § 2- 25(l), because that section does not give anyone discretion to determine when an employee can be demoted. According to § 2-25(l), permanent employees can only be demoted under three circumstances, none of which requires a discretionary determination.

**\*8** The court finds that the remaining three violations alleged by plaintiff are based on discretionary provisions of the Charter; thus, defendant is immune from liability for any violations of such. Section 2-20(c)(4) of the Charter provides defendant with the authority to determine whether or not a vacant position could be subject to competitive recruiting. Therefore, the Council had the discretion to "hire out" the Chief of Police position and is immune from suit under state law on this basis. [FN11]

FN11. Although the Council had the discretion to hire out the Chief of Police position, it did not have the discretion to do so for discriminatory purposes.

With respect to defendant requiring plaintiff to undergo a background check, § 2-21(b) of the Charter allows defendant to require candidates to provide information on "qualification criteria." The only limitation in the section relates to information that "does not meet the test of job relatedness nor any information of a discriminatory nature." The provision does not address what types of information are considered "qualification criteria" nor how information is to be judged by "the test of job relatedness." As such, the provision gives defendant discretion to determine what types of information are relevant to an application. In this case, plaintiff has not provided any evidence from which a reasonable jury could infer that a background check was not related to one's qualifications to be the Chief of Police. [FN12]

FN12. The mere assertion that plaintiff, an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 549531 (D.Del.)

**(Cite as: 2005 WL 549531 (D.Del.))**

Page 9

African-American, was the first applicant for Chief of Police to be required to submit to a background check is insufficient. The plaintiff does not cite any evidence to support his contention, nor does he assert that all of the applicants for Chief of Police were not required to submit to background checks, regardless of their race.

Finally, § 2-24 is clearly discretionary because it states that the Personnel Officer "may" encourage training and "may" make training programs available. Nothing in the Charter requires defendant to provide training opportunities to employees.

For the reasons stated, defendant's motion for summary judgement is granted with respect to plaintiff's claims that: (1) the decision to conduct open and competitive recruiting for the position of Chief of Police violated the Charter; (2) requiring him to submit to a background check violated the Charter; and (3) denying him training opportunities violated the Charter. Defendant's motion for summary judgment is denied with respect to plaintiff's claims that defendant violated the Charter when it discriminated against him based on race and "demoted" him from Assistant Chief of Police to Lieutenant.

E. Damages

1. Future Special Damages

As discussed in the telephone conference with the court conducted on March 4, 2005, plaintiff is precluded from presenting expert testimony as to future special damages because no expert report was submitted by plaintiff prior to the July 30, 2004 close of discovery. However, plaintiff is not precluded from presenting other evidence of future damages to carry his burden of proof. Therefore, defendant's motion for summary judgment is denied with respect to plaintiff's claims for future damages.

2. Punitive Damages

Defendant argues that because it is a municipality, plaintiff cannot seek punitive damages under § 1981

. Plaintiff does not contest defendant's claim. Case law supports defendant's analysis of § 1981. *See, e.g., City of Newport v. Fact Concepts, Inc.,* 453 U.S. 247 (1981); *Bell v. City of Milwaukee,* 746 F.2d 1205, 1270 (7th Cir.1984). Therefore, the court grants defendant's motion with respect to punitive damages.

V. CONCLUSION

**\*9** For the reasons stated, plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is denied in part and granted in part. Defendant's motion is granted as to plaintiff's claims of violation of § 1981 and retaliation in violation of Title VII. Defendant's motion is denied as to plaintiff's claims of discrimination in violation of Title VII. Defendant's motion is denied with respect to immunity from state law claims for violating §§ 2-20(b) and 2-25(1) of the Charter, and granted with respect to §§ 2-20(c)(4), 2-21(b) and 2-24. The court further concludes that plaintiff is not precluded from asserting claims for future damages, but is precluded from seeking punitive damages.

An order consistent with this memorandum opinion shall issue.

ORDER

At Wilmington this 8th day of March, 2005, consistent with the memorandum opinion issued this date;

IT IS ORDERED that:

1. Defendant's motion for summary judgement (D.I.37) is granted as to the following claims:

a. Plaintiff's claims of violation of 42 U.S.C. § 1981 ;

b. Plaintiff's claims of retaliation in violation of Title VII;

c. Plaintiff's state law claims for violations of the §§ 2-20(c)(4), 2-21(b) and 2-24 of the Charter; and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 10

Not Reported in F.Supp.2d, 2005 WL 549531 (D.Del.)

**(Cite as: 2005 WL 549531 (D.Del.))**


d. Plaintiff's claims for punitive damages.

2. Defendant's motion for summary judgment (D.I.37) is denied as to the following claims:

a. Plaintiff's claims of racial discrimination in violation of Title VII;

b. Plaintiff's state law claims for violations of the §§ 2-20(b) and 2-25(l) of the Charter; and

c. Plaintiff's claims for future damages.

3. Plaintiff's motion for summary judgment (D.I.40) is denied.

Not Reported in F.Supp.2d, 2005 WL 549531 (D.Del.)

### Motions, Pleadings and Filings (Back to top)

• 1:03CV00876 (Docket)
                    (Sep. 11, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.