# A1 – A35

# CHRYSLER CORPORATION
*An Equal Opportunity Employer*

## Application for Employment

Chrysler Corporation or Subsidiaries

**Instructions:** Please furnish complete and accurate information. Applications will be verified. Incomplete applications will not be considered. In addition to completing this form, you may attach a resume detailing your professional, educational, and social activities.

**DATE AVAILABLE TO BEGIN WORK:** 3/25/97

## PERSONAL INFORMATION

| LAST NAME (Print) | FIRST NAME | INITIAL | SOCIAL SECURITY NUMBER |
|---|---|---|---|
| PETRUCELLI | DINO | G. | 221-60-152? |

**OTHER NAME(S) UNDER WHICH ATTENDED SCHOOL OR EMPLOYED**

| PRESENT ADDRESS | | | |
|---|---|---|---|
| NUMBER AND STREET | 970 RUE MADORA | | |
| CITY | BEAR | STATE DE | ZIP CODE 19701 |

| PERMANENT ADDRESS IF DIFFERENT | | | |
|---|---|---|---|
| NUMBER AND STREET | | | |
| CITY | | STATE | ZIP CODE |

**TELEPHONE NUMBER:** 302-832-9127

**U.S. CITIZEN:** No ☐  Yes ☒

If no, enter visa type: _____  Visa No. _____

Check if Under 18 Years of Age ☐

Have you ever worked for Chrysler Corporation or subsidiaries?  No ☒  Yes (Indicate) ☐

Are you a Vietnam Era Veteran? No ☒  Yes ☐  Vietnam Veterans are those who served, at least 180 days on active duty, in any branch of the U.S. Armed Forces in any location during the period from August 5, 1964, until May 7, 1975.

| LAST PLANT OR OFFICE | SEPARATION DATE | REASON FOR LEAVING |
|---|---|---|

Have you been convicted by a civilian or military court for violating any law within the past seven (7) years (unless otherwise specified, all convictions are included except minor traffic offenses)?  No ☒  Yes (Indicate) ☐

| DATE | OFFENSE | DISPOSITION | CITY – STATE |
|---|---|---|---|

## EDUCATIONAL SPECIAL INTEREST QUALIFICATIONS

| EDUCATION | TOTAL CREDIT YEARS | SCHOOL NAME | CITY | STATE | COURSE OF STUDY | CERTIFICATE DIPLOMA DEGREE | DID YOU GRAD. | GRADE AVERAGE |
|---|---|---|---|---|---|---|---|---|
| Grade – High School (Show last attended) | 4 | Christiana High School/Newark, DE | | | Required | Diploma | No ☐ Yes ☒ | C |
| Business/Trade School | 2 | Hodgeson Vo-Tech | | | Electrical Trades | N/A Incomplete | No ☐ Yes ☒ | B |
| College(s) 1. | | N/A | | | | | No ☐ Yes ☐ | |
| 2. | | | | | | | No ☐ Yes ☐ | |
| 3. | | | | | | | No ☐ Yes ☐ | |
| 4. | | | | | | | No ☐ Yes ☐ | |
| Post-Graduate Education | | | | | | | No ☐ Yes ☐ | |
| | | | | | | | No ☐ Yes ☐ | |

OTHER TRAINING, QUALIFICATIONS AND SKILLS SUCH AS DRAFTER, APPRENTICESHIP, LANGUAGES, TYPING, ETC.

ELECTRICAL APPRENTICE, SPANISH, BASIC COMPUTER

SPECIAL INTEREST:
OUTDOOR ACTIVITIES
SWIMMING, HIKING, BICYCLING

**CAN YOU WORK ANY SHIFT:** No ☐  Yes ☒

**EXPECTED DATE/SALARY:** _____

**WOULD YOU RELOCATE:** No ☐  Yes ☒

## POSITION DESIRED

-0112 (REV. 12/95)

D 000007

A1

**ADDITIONAL INSTRUCTIONS:** List employment starting with your most recent employer. Account for all periods, including military service, Chrysler experience, and periods of unemployment. If the space provided does not cover at least 7 years, attach additional sheet or complete resume.

## EMPLOYMENT INFORMATION

| FROM MO./YR. | TO MO./YR. | FIRM NAME | STREET ADDRESS | CITY | STATE | ZIP CODE | BASE EARNINGS | REASON FOR LEAVING |
|---|---|---|---|---|---|---|---|---|
| 10/96 | | Hes. Petrocelli Const. | 23 Whitehaven Dr. | New Castle | DE | | $ 400 per wk | N/A |

SUPERVISOR NAME/TELEPHONE NO. (302) 328-2909
JOB TITLE AND DUTIES: Apprentice (electrical-carpentry-plumbing)

Carlo Petrocelli

| FROM MO./YR. | TO MO./YR. | FIRM NAME | STREET ADDRESS | CITY | STATE | ZIP CODE | BASE EARNINGS | REASON FOR LEAVING |
|---|---|---|---|---|---|---|---|---|
| 9/92 | 10/96 | Linens of The Week | | Wilm | DE | 19801 | $ 11.25 per hr | Poor work cond. |

SUPERVISOR NAME/TELEPHONE NO. (302) 322-2136
JOB TITLE AND DUTIES: Route Representative (Driver)

John Mezzaresi

| FROM MO./YR. | TO MO./YR. | FIRM NAME | STREET ADDRESS | CITY | STATE | ZIP CODE | BASE EARNINGS | REASON FOR LEAVING |
|---|---|---|---|---|---|---|---|---|
| 2/90 | 9/92 | MarCare Video | 1724 Lancaster | Wilm | DE 19808 | | $ 7.00 per hr | Other job opportunity |

SUPERVISOR NAME/TELEPHONE NO. (302) 429-1867
JOB TITLE AND DUTIES: Counter Manager - (clerical + money management)

Javier Sanchez

| OTHER WORK EXPERIENCE WITHIN PAST SEVEN (7) YEARS | FROM/TO |
|---|---|
| 1. Unemployed | 9/89 to 2/90 |
| 2. | |
| 3. | |
| 4. | |

**READ CAREFULLY BEFORE SIGNING:**

1. I have read and do understand the statements contained herein and certify that they are true.
2. I understand that false or incomplete statements on this application or in my resume or supporting documents I have supplied are grounds for dismissal.
3. I authorize Chrysler Corporation or any of its subsidiaries, agents, or employees ("Chrysler") to investigate all statements that I have made on this application. I understand that Chrysler's pre-employment Investigation with my application to former employers, personal references and educational institutions in connection may also include a check of my criminal record. I understand that Chrysler's pre-employment Investigation any conviction. I understand that any information gathered as a result of this investigation will be used solely for purposes of determining my fitness for employment. I consent to the Investigation to be conducted and to the release to Chrysler of the information specifically described in any separate consents and authorizations I have signed, which shall become a part hereof, in consideration of Chrysler's review of my application, I agree to release and hold harmless Chrysler, its subsidiaries, agents, and employees, and all previous employers and educational institutions, from any claimed liability arising from this investigation.
4. I understand that any offer of employment made to me will be conditioned upon the results of a physical examination by a physician selected by Chrysler, to be conducted after the offer has been made, and upon the results of a drug screening test conducted in accordance with Chrysler policy.
5. In the event that I am employed by Chrysler Corporation or any of its subsidiaries, I agree to comply with and to be governed by all its policies and procedures in effect at a given time, and I acknowledge that none of the policies and procedures constitute terms of employment contrary to paragraph 6 below. I agree that I will be governed by and must comply with Chrysler's

6. Employee Dispute Resolution Process, which requires many employment-related claims to be resolved exclusively through arbitration.
7. I understand that this application is for employment of an indefinite duration, terminable at will and for any reason, either by me or by Chrysler Corporation or any of its subsidiaries, except as otherwise provided by the terms of a collective bargaining agreement, if any, applicable to me, and that the terms of paragraph 6 cannot be altered except by a written agreement executed by an Officer of Chrysler Corporation or the subsidiary which employs me.
8. In consideration of Chrysler's review of my application, I agree that any claim or lawsuit arising out of my employment with, or my application for employment with, Chrysler Corporation or any of its subsidiaries must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit. While I understand that the statute of limitations for claims arising out of an employment action may be longer than six (6) months, I agree to be bound by the six (6) month period of limitations set forth herein, and I WAIVE ANY STATUTE OF LIMITATIONS TO THE CONTRARY. Should a court determine in some future lawsuit that this provision allows an unreasonably short period of time to commence a lawsuit, the court shall enforce this provision as far as possible and shall declare the lawsuit barred unless it was brought within the minimum reasonable time within which the suit should have been commenced.
9. This application form supersedes any other application forms that I have previously submitted to Chrysler.

NOTE: A PHOTOCOPY OF THIS STATEMENT SHALL BE AS VALID AS THE ORIGINAL.

Applicant's Signature _____   Date 3/15/97

(This application will be considered active for twelve (12) months from the date filed. If you are hired, it becomes part of your official employment record.)

---

**FOR PERSONNEL USE ONLY**

General Comments, Test Information, Etc.

Acceptable for Hire ☐
□ Interest ☐ □ (state reasons).

Interviewer's Signature _____   Date _____

D 000008

A2



**WILCOX & FETZER LTD.**

In the Matter Of:

# Petrocelli

## v.

# Chrysler Corporation

## C.A. # 04-CV-943-KAJ

---

Transcript of:

# Dino G. Petrocelli

## Volume # 1

## August 8, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A3

Petrocelli
Dino G. Petrocelli, Volume 1

v.
C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 8, 2005

Page 30

```
 1   Q.  Were you receiving treatment for any injuries?
 2   A.  No.
 3   Q.  Had you received any injuries?
 4   A.  Yes.  None that needed medical attention.
 5   Q.  What were your injuries?
 6   A.  I was hit in the back of a head with a bottle.
 7   I was stabbed in the back with a steak knife, I
 8   believe it was.
 9   Q.  You were stabbed in the back with a steak knife
10   and you did not receive medical treatment?
11   A.  No.  Pokes or whatever.
12   Q.  Did it hurt?
13   A.  Yeah.  Yeah, it hurt.
14   Q.  Did your brother suffer any stab wounds?
15   A.  No.
16   Q.  Just being hit in the head with a bottle?
17   A.  Yes.
18   Q.  It sound like there was a fight that took place
19   before you got to Christiana Hospital?
20   A.  That's correct.
21   Q.  Where did the fight take place?
22   A.  In my daughter's mother's house.
23   Q.  What is your daughter's mother's name?
24   A.  Jessica.
```

Page 31

```
 1   Q.  What's her last name?
 2   A.  Risner.
 3   Q.  How do you spell that?
 4   A.  R-I-S-N-E-R.
 5   Q.  What was her first name again?  I'm sorry.
 6   A.  Jessica.
 7   Q.  What led up to that altercation?
 8   A.  It was New Year's Eve.  We were asked to stop
 9   over at -- I just separated from my daughter's mother.
10   She wanted to reconcile and just be friends and all
11   that and invited us over.  When we stopped over there,
12   we were surrounded by her friends and her, and her
13   brother and his friends and were jumped, basically.
14   Q.  Do you have any idea why they jumped you and
15   your brother?
16   A.  Because they're crazy.
17   Q.  Had you previously had problems with them?
18   A.  Not to that extent, no.
19   Q.  Did any of the people associated with Jessica
20   suffer any injuries?
21   A.  I believe so, yes.
22   Q.  What injuries did they suffer?
23   A.  I don't know exactly.  I know my brother said
24   he seen one of them getting treatment for something.
```

Page 32

```
 1   I don't know.
 2   Q.  Were there any guns involved?
 3   A.  No.
 4   Q.  It sounds like knives and bottles?
 5   A.  Yes.
 6   Q.  What happened as a result of that arrest?  Were
 7   you charged with a crime?
 8   A.  Yes, we were.
 9   Q.  Both of you?
10   A.  Mm-hmm.
11   Q.  What crimes were you charged with?
12   A.  Just offensive touching.
13   Q.  Offensive touching?
14   A.  Yes.
15   Q.  For both of you?
16   A.  I believe so.
17   Q.  You were not charged with any other offenses?
18   A.  No.
19   Q.  Tell me about the second time you were
20   arrested.
21   A.  It was for possession of cocaine.
22   Q.  Let me back up for just a second.  When was the
23   first arrest for the fight we just talked about?
24   A.  In January of -- I believe it was 2000 or 2001.
```

Page 33

```
 1   Something like that.
 2   Q.  When did the second arrest happen?
 3   A.  March of 2002.
 4   Q.  That was for possession of cocaine?
 5   A.  Yes.
 6   Q.  Where were you arrested for possession of
 7   cocaine?
 8   A.  Wilmington.
 9   Q.  Where in Wilmington?
10   A.  I don't know exactly.  I guess right on Fourth
11   Street.
12   Q.  What were you doing at the time you were
13   arrested?  Were you driving?
14   A.  I was a passenger in a vehicle.
15   Q.  Was anyone else arrested with you?
16   A.  No.
17   Q.  Who was with you?
18   A.  A girl I was seeing at that time.
19   Q.  What's her name?
20   A.  Shannon.
21   Q.  And her last name?
22   A.  Logan.
23   Q.  Is Shannon Logan a former employee of
24   DaimlerChrysler?
```

A4

9 (Pages 30 to 33)

Petrocelli
Dino G. Petrocelli, Volume 1

v.
C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 8, 2005

Page 34

1    A.  Yes.
2    Q.  She worked at the Newark PDC with you?
3    A.  Yes.
4    Q.  Let me just back up a second.  The first time
5    you were arrested and then charged with offensive
6    touching, were you convicted as a result of that
7    charge?
8    A.  Yes.
9    Q.  Were you convicted of offensive touching or
10   some other offense?
11   A.  No, just for offensive touching.
12   Q.  Did you receive a sentence?
13   A.  Yes.
14   Q.  What was your sentence?
15   A.  Probation.
16   Q.  How long?
17   A.  I believe it was a year probation.  Something
18   like that.
19   Q.  One year?
20   A.  Yes.
21   Q.  Did your brother also receive a sentence?
22   A.  Yes.
23   Q.  Convicted of offensive touching?
24   A.  I don't know exactly what his charge was.

Page 35

1    Q.  Do you know his sentence?
2    A.  I believe it was probation for a year also.
3    Q.  Did you ever serve any time in jail or prison
4    as a result of that arrest incident?
5    A.  Just a few days.
6    Q.  When you were arrested?
7    A.  Yes.
8    Q.  Did you serve out your entire probation
9    successfully?
10   A.  No.  Because the second time I was arrested, I
11   violated probation.
12   Q.  So the second arrest for possession of cocaine
13   was while you were still on probation for the first
14   offense?
15   A.  Yes, that's correct.
16   Q.  So you were charged with possession of cocaine
17   when you were a passenger in a vehicle with Shannon
18   Logan?
19   A.  Yes.
20   Q.  Were you taken to jail?
21   A.  Yes.
22   Q.  How long did you spend in jail?
23   A.  A few hours.
24   Q.  How much cocaine were you in possession of?

Page 36

1    A.  Maybe about a gram of cocaine.
2    Q.  Were you charged with a crime?
3    A.  Yes.
4    Q.  What crime?
5    A.  Possession of a controlled substance.
6    Q.  Were you convicted of possession of a
7    controlled substance?
8    A.  Yes.
9    Q.  And what was your -- did you receive a
10   sentence?
11   A.  Well, I violated probation, so --
12   Q.  So, there were essentially two charges,
13   possession of a controlled substance and probation
14   violation?
15   A.  Yes.
16   Q.  Did you receive a sentence?
17   A.  Yes.
18   Q.  What was the sentence?
19   A.  Involvement in the Crest Program, which is a
20   drug program in a prison.  I guess it's a state-funded
21   program.  Basically, I'm in the custody of the state
22   until I complete the program, which I completed.
23   Q.  Let me make sure I understand.  I didn't catch
24   what you called that program.

Page 37

1    A.  Crest, C-R-E-S-T.
2    Q.  What does that stand for, if you know?
3    A.  I don't know.
4    Q.  So you were incarcerated during the time that
5    you had to complete the Crest Program?
6    A.  Correct.
7    Q.  Where were you incarcerated?
8    A.  Smyrna, Delaware.
9    Q.  How far is that from here?  Again, I'm
10   unfamiliar with the area.
11   A.  Maybe about 45 minutes.
12   Q.  How long were you incarcerated at Smyrna?
13   A.  Well, see, it's a program -- first, I was here
14   in Wilmington maybe for a month until there was an
15   opening in the program.  Then I was in the Crest
16   Program in Smyrna for three months.  After I got out
17   of there, three, four more months in Wilmington again.
18   Q.  When you say you did one month in Wilmington,
19   three months at Smyrna, and then one more month here?
20   A.  Three more -- four more months.
21   Q.  Four more months here.  Where do you mean when
22   you say "here"?
23   A.  In the Plummer Center.
24   Q.  What is the Plummer Center?

A5

10 (Pages 34 to 37)

Petrocelli                              v.                    Chrysler Corporation
Dino G. Petrocelli, Volume 1    C.A. # 04-CV-943-KAJ              August 8, 2005

Page 38

1   A.  It's a work release program.
2   Q.  So at that time, were you incarcerated or not?
3   A.  Well, basically, I had free time to go to work
4   and then stayed there after work.
5   Q.  Were you monitored in any way when you were not
6   at the center?
7   A.  Yes.
8   Q.  Electronic monitoring of some sort?
9   A.  No.
10  Q.  How were you monitored?
11  A.  Just random visits to my job site.  Calls to my
12  employer.  It was a program I went through at the
13  Plummer Center where there is a lot of involvement in
14  group sessions and stuff like that, so it was
15  monitoring there within the group and counselors.
16  Q.  Was Shannon Logan arrested at the same time you
17  were?
18  A.  No.
19  Q.  So if I understand correctly, you served,
20  roughly, eight months as a result of your conviction
21  for possession of cocaine -- possession of a
22  controlled substance and your probation violation?
23  A.  That's correct.
24  Q.  Did you have any continuing probation after you

Page 39

1   were released from the Plummer Center?
2   A.  Yes.
3   Q.  How long?
4   A.  I believe it was another year, until January of
5   2003.
6   Q.  You mentioned a third arrest.  What was that
7   for?
8   A.  I believe it was a domestic dispute I had with
9   my ex.
10  Q.  Do you remember, roughly, what time period that
11  would have been?
12  A.  Maybe about 1999 sometime.
13  Q.  What was the nature of the domestic dispute?
14  A.  Just yelling and screaming.
15  Q.  Did your -- was it your spouse at the time?
16  A.  No.  Just my --
17  Q.  Girlfriend?
18  A.  Yeah, my daughter's mother.
19  Q.  Jessica?
20  A.  Yes.
21  Q.  Did she call the police?
22  A.  No.
23  Q.  Who called the police?
24  A.  Neighbors.

Page 40

1   Q.  And you were arrested?
2   A.  Yes.
3   Q.  Were you charged with a crime?
4   A.  No.
5   Q.  How long did you spend in jail, if any?
6   A.  A few hours.
7   Q.  Then you were released without charge?
8   A.  That's correct.
9   Q.  Any other times that we have not discussed that
10  you were arrested?
11  A.  Just when I was a juvenile.
12  Q.  How many times were you arrested as a juvenile?
13  A.  Just once, I believe.
14  Q.  How old would you have been?
15  A.  17.  I'm pretty sure 17.
16  Q.  What were you arrested for?
17  A.  Under-age intoxication or something like that.
18  Q.  Were you convicted of that offense?  Excuse me.
19  Were you charged with that offense?
20  A.  Yes.
21  Q.  Were you convicted of it?
22  A.  Yes.
23  Q.  Did you receive a sentence?
24  A.  Yes.

Page 41

1   Q.  What was that sentence?
2   A.  Counseling.
3   Q.  Did you complete that counseling program?
4   A.  Yes.
5   Q.  Any other times that you have been arrested?
6   A.  Not that I can recall, no.
7   Q.  So as I understand it, you have been convicted
8   twice, once for possession of controlled substances
9   and a probation violation and once for offensive
10  touching?
11  A.  That's correct.
12  Q.  Were those the only convictions you've had in
13  your whole life?
14  A.  Yes.
15  Q.  Were you represented by attorneys for each of
16  those arrests?
17  A.  Yes.
18  Q.  The same attorney or different attorneys?
19  A.  Different attorneys.
20  Q.  Were those attorneys appointed or did you pay
21  for them?
22  A.  I paid for them.  At that time, I was employed
23  at Chrysler.
24  Q.  So which of these offenses that we discussed

A6                11 (Pages 38 to 41)

Petrocelli
Dino G. Petrocelli, Volume 1

v.
C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 8, 2005

Page 42

1  did you have attorneys that you paid for?
2  **A.  For both.**
3  Q.  For the offensive touching and the cocaine
4  conviction?
5  **A.  Yes, that's correct.**
6  Q.  Did you try to hire those lawyers to help you
7  with your current lawsuit?
8  **A.  No.  They're criminal attorneys.**
9  Q.  How much did you pay to each of those for
10  representation?
11  **A.  Roughly, about 3,000, I think for the first**
12  **charge of offensive touching.**
13  Q.  And the second, for cocaine and probation
14  violation?
15  **A.  That was about the same.**
16  Q.  Have you ever used drugs?
17  **A.  Yes.**
18  Q.  What drugs have you used?
19  **A.  Cocaine.**
20  Q.  Any others?
21  **A.  No.**
22  Q.  Cocaine is the only drug that you have ever
23  used?
24  **A.  Yes.**

Page 43

1  Q.  Do you currently use cocaine?
2  **A.  No.**
3  Q.  When is the last time you used cocaine?
4  **A.  March of two-thousand --- that same day I was**
5  **charged.**
6  Q.  I want to make sure I am clear on that.
7  **A.  2002.**
8  Q.  March 2002?
9  **A.  Yes.**
10  Q.  When did you begin using cocaine, roughly, if
11  you remember?
12  **A.  Roughly, I guess about 2001.**
13  Q.  So you used cocaine during the time that you
14  were an employee of DaimlerChrysler?
15  **A.  That's correct.**
16  Q.  Did you ever go to work at DaimlerChrysler
17  under the influence of cocaine?
18  **A.  No.**
19  Q.  How long did the effects of cocaine use stay in
20  your system after you used it?
21  **A.  The effects as far as physically feeling, or?**
22  Q.  I am not sure of the effects of cocaine.
23  **A.  Oh.  Just a few hours.**
24  Q.  What shift did you work at DaimlerChrysler?

Page 44

1  **A.  The second shift.**
2  Q.  And that runs from?
3  **A.  3:30 to 12:00.**
4  Q.  If I understand your testimony correctly, you
5  never attended work at DaimlerChrysler under the
6  influence of cocaine?
7  **A.  That's correct.**
8  Q.  But you have acknowledged that you were using
9  cocaine during the time that you were employed by
10  DaimlerChrysler?
11  **A.  Yes.**
12  Q.  As I mentioned earlier I want to talk a little
13  bit more in detail about your employment background.
14  What was your first employer after high school?
15  **A.  I can't remember that far back.  I believe it**
16  **was a restaurant.**
17  Q.  Do you remember the name?
18  **A.  It used to be called Alyson's Restaurant.**
19  Q.  Alyson's or Alice?
20  **A.  Alyson's.**
21  Q.  Alyson's?
22  **A.  Yes.**
23  Q.  How long did you work there?
24  **A.  Maybe about four or five months.**

Page 45

1  Q.  Why did you leave employment there?
2  **A.  Because -- excuse me.  I'm sorry.**
3  **Because I was starting employment with the**
4  **electricians corporation Pace Electric.**
5  Q.  What job did you hold at Alyson's restaurant?
6  **A.  Dishwasher.**
7  Q.  You left Alyson's to go to work for Pace
8  Electric?
9  **A.  Yes.**
10  Q.  How long did you work for Pace Electric?
11  **A.  Maybe about eight months, I believe.**
12  Q.  What was your job at Pace Electric?
13  **A.  An electrician's apprentice.**
14  Q.  How long is an electrician's apprentice
15  program?
16  **A.  From what I understand, it can be anything from**
17  **four to five years, which most of them is five years.**
18  Q.  But it sounds like you --
19  **A.  I'm sorry.  Okay.**
20  Q.  It sounds like you only worked for Pace
21  Electric as an electrician's apprentice for, roughly,
22  eight months?
23  **A.  That's correct.  I was laid off.**
24  Q.  Is Pace Electric located in Wilmington?

A7

12 (Pages 42 to 45)

Petrocelli
Dino G. Petrocelli, Volume 1

v.
C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 8, 2005

Page 66

1    A.  Yes. I can't afford any attorney, at all.
2    Q.  Have you ever been named as a defendant in a
3  civil lawsuit?  In other words, has anybody ever sued
4  you?
5    A.  No.
6    Q.  At this point, I want to talk about your
7  employment with DaimlerChrysler specifically.  And I
8  believe you said at the time it was Chrysler
9  Corporation?
10    A.  Yes.
11    Q.  Tell me:  Why did you initially have interest
12  in working there?
13    A.  Why did I have interest?  Because it was a
14  job -- it was like a -- as far as income and all that,
15  it was a comfortable -- I mean, I have a daughter.  I
16  had a house and all that that I was paying on.  It was
17  comfortable as far as paying the bills and being able
18  to get by.  There was opportunities as far as
19  education, paying for education and all that,
20  benefits.
21    Q.  How did you learn about the job?
22    A.  I applied -- actually, the LACC, I told them I
23  was looking for employment.  And they told me to come
24  in and take a preemployment test with -- I can't

Page 67

1  remember the -- it was a consulting firm or something
2  like that that Chrysler hired.  Kind of like
3  preemployment, you know, I guess giving tests and the
4  abilities and all that and check you out as far as
5  that goes and put you on the list and then Chrysler
6  calls us a few months later.
7    Q.  What was the period of time between when you
8  took the test and got hired on, was how long?
9    A.  Maybe about three or four months.
10    Q.  You were referred to Chrysler Corporation by
11  the Latin American Community Center?
12    A.  That's correct.  I think it was called AON
13  Consulting or something -- A-O-N -- was doing the
14  testing and all.
15    Q.  At the time when you started working for
16  Chrysler, did you know anyone who worked there already
17  or have any friends there or relatives or anyone like
18  that?
19    A.  Just my father worked there at the assembly
20  plant.
21    Q.  Did your father work at the assembly plant his
22  whole life as a career?
23    A.  No. Not his whole life, no.
24    Q.  How long did he work there?

Page 68

1    A.  I think when he retired he might have had 20
2  years, maybe less.
3    Q.  And he retired from there?
4    A.  Yes.
5    Q.  I assume he enjoyed his years of employment
6  with the Chrysler Corporation?
7    A.  Actually, he wished he never retired, to tell
8  you the truth.  He's bored.
9    Q.  So he had favorable things to tell you about
10  his work experience with Chrysler Corporation?
11    A.  Well, he told me there was a lot of
12  opportunities there.  I know just by association a lot
13  of people say that there is good money to make, you
14  know, and all that.  By everybody that I know that I
15  have seen that worked at Chrysler was pretty
16  comfortable as far as lifestyle.  And I just wanted
17  that kind of security.
18    Q.  But you didn't -- besides your dad, you didn't
19  know any friends or anybody else that was working
20  there?
21    A.  Well, just like associates.
22    Q.  What do you mean when you say "associates"?
23    A.  You know, when you are out in public and people
24  ask where you work, and where you work, they say, oh,

Page 69

1  Chrysler, they go on about, you know, how they get the
2  work, you know, the hours and they have a comfortable
3  living.  You know, all that kind of stuff.
4    Q.  So you heard good things about it?
5    A.  Yes.
6    Q.  So if I'm correct, what motivated you to apply
7  at Chrysler Corporation was the opportunities and the
8  benefits and the pay?
9    A.  Yes.  And to be able to provide for my
10  daughter.  You know, the stuff I can't do now with $10
11  an hour, anyway.
12    Q.  When did you apply to work for Chrysler
13  Corporation?
14    A.  I think it was in February of 1997.
15    Q.  And how did you apply?  In other words, was it
16  in person?
17    A.  At LACC, they had the AON Consulting there and
18  handing out applications.  Everybody in the group
19  filled them out.  Then we were called in, I think a
20  few weeks later to do testing.
21    Q.  Was there some sort of a job fair or something
22  that AON was at the Latin American Community Center?
23    A.  I guess it would be considered like a job fair,
24  yes.

A8

18 (Pages 66 to 69)

Petrocelli                                    v.                        Chrysler Corporation
Dino G. Petrocelli, Volume 1          C.A. # 04-CV-943-KAJ                    August 8, 2005

Page 70

1    Q.   You filled out the paperwork there?
2    A.   Yes.
3    Q.   I'm sorry.  Did you say they called you in then
4    for testing?
5    A.   Yes.
6    Q.   What test did they perform?
7    A.   Just aptitude tests, you know, recognizing as
8    far as numbers and shapes and, you know, written
9    problem-solving, stuff like that.
10   Q.   Any physical tests, agility tests?
11   A.   Yes.  After we passed the written test, then we
12   were sent a few weeks later after that to -- I think
13   it was the Holiday Inn or something and did agility
14   tests there.
15   Q.   Any other testing after that?
16   A.   No.  A urine test.
17   Q.   Did --
18   A.   Physical and all that.
19   Q.   Was there a group of people that you applied
20   with or that you went through the testing with?
21   A.   Yes.
22   Q.   And who -- how many people were in that group?
23   A.   The final group -- well, it started out with a
24   larger group, and little by little, it dwindled down.

Page 71

1    The final group was, I think about six people maybe
2    and some of them actually were hired into Mopar also.
3    Q.   What was the racial makeup, if you recall, of
4    that group of six?
5    A.   I think it was mostly white.
6    Q.   All white except for yourself?
7    A.   I think so.
8    Q.   There were no African-American people in the
9    group?
10   A.   I think maybe one or two.  Yeah, maybe one or
11   two.
12   Q.   So one or two African-American folks --
13   A.   Oh, yeah, there were two.  Actually two of them
14   were hired the same day I was hired.
15   Q.   So two African-American individuals --
16   A.   Myself --
17   Q.   -- and yourself?
18   A.   -- and maybe a few other.
19   Q.   Maybe three Caucasian people?
20   A.   Maybe three or four.  I can't remember exactly.
21   It's been awhile.
22   Q.   It has.
23   A.   Yeah.
24   Q.   For what position did you apply or did you

Page 72

1    apply for one specifically?
2    A.   I don't think there was a specific position at
3    all.  I think it was just any available or something
4    like that.
5    Q.   Just a general application?
6    A.   Yes.
7    Q.   What qualification did you list for your job,
8    if any?
9    A.   Well, I was quick learner.  Physically, I am
10   capable of doing heavy lifting of stuff.  Very
11   efficient.  I get along with everybody.  I guess the
12   basic requirements of any -- any employer would want
13   from somebody -- a new employee anyway.
14   Q.   Do you recall who interviewed you or if that
15   process was through AON or if that was through
16   Chrysler Corporation?
17   A.   The initial interview was through Chrysler
18   Corporation.
19   Q.   Do you remember who interviewed you?
20   A.   Yes.
21   Q.   Who was that?
22   A.   Mike Fisher and Carl Roehonan.
23   Q.   So you interviewed with them before you went
24   through the AON process?

Page 73

1    A.   No.  After the AON process, after I passed all
2    the physical and all that stuff.  AON, there was no
3    initial interview or anything there.  It was,
4    basically, testing and seeing who can follow through
5    with the testing, and I guess they would let public
6    relations know at Chrysler.
7    Q.   And then they must have had an opening at the
8    PDC and they called you in?
9    A.   Yes.
10   Q.   And you interviewed with Mike Fisher and Carl
11   Roehonan?
12   A.   Yes.
13   Q.   Were those two individuals supervisors at the
14   time?
15   A.   I believe Carl Roehonan was a warehouse manager
16   or something to that regard.  Mike Fisher was a
17   supervisor.
18   Q.   And how did that interview go?
19   A.   Well, I think it went well.
20   Q.   Anything stand out in your mind about that
21   interview?
22   A.   Yes.                                        A9
23   Q.   What is that?
24   A.   Carl asked me, or Mr. Roehonan, asked me if I

19 (Pages 70 to 73)

Petrocelli                                    v.                        Chrysler Corporation
Dino G. Petrocelli, Volume 1          C.A. # 04-CV-943-KAJ                August 8, 2005

Page 74

1  was Hispanic, and I told him, Yes. And he said I
2  didn't look Hispanic. He asked me to say a few things
3  in Spanish. Then when I did, he told me he didn't
4  know what I said, but it sounded good or something to
5  that regard. He said the only Spanish he ever hears
6  is on the TV because his sons play soccer or something
7  like that. And then Mike laughed. They said that I
8  had a good interview, and that was about it.
9      Q.  Did you subsequently work with Mr. Fisher and
10 Mr. Roehonan?
11     A.  No.
12     Q.  Did you like them as a result of your
13 interview?
14     A.  I thought they were all right, yeah. I thought
15 they were pretty good people. I think the remark was,
16 basically, just ignorance. I didn't take it too
17 offensively. You know what I mean? It did stand out
18 because I never heard that I don't look Hispanic
19 before.
20     Q.  So if I understand correctly, that conversation
21 started as a result of Mr. Roehonan asking you if you
22 spoke Spanish?
23     A.  Well, he said on the application I put down
24 Hispanic, and he asked me if I was Hispanic. And he

Page 75

1  said I didn't look Hispanic. And I guess he wanted me
2  to say a few things in Spanish to prove that I was
3  Spanish or something.
4      Q.  He said that you wrote down on your application
5  that you were Hispanic?
6      A.  Yes.
7      Q.  Do you recall writing down on your application
8  that you were Hispanic?
9      A.  Not exactly, but. I know he seen it written
10 down somewhere.
11         Actually, I think the human relations,
12 or -- yeah, the human relations representative called
13 LACC saying they were looking for Hispanic people or
14 something like that, to that regard, and that's why
15 they were going through the LACC for the hiring
16 process. So I don't know if he had notes or something
17 written down of what it was exactly, but. I know he
18 looked down at a piece of paper and said, "Are you
19 Hispanic?"
20         MS. PAGE: Could I please have this marked
21 as Exhibit 1?
22         (Petrocelli Deposition Exhibit No. 1 was
23 marked for identification.)
24

Page 76

1  BY MS. PAGE:
2      Q.  Mr. Petrocelli, I have just had marked a
3  document that is entitled "Application for
4  Employment." And it is numbered on the bottom a
5  little bit left of center D 000007. Do you see that
6  number? It's next to the shaded box at the bottom
7  that says "Position Desired."
8      A.  Yes, I see that.
9      Q.  This document has been marked as Exhibit 1. Do
10 you recognize it?
11     A.  Yes.
12     Q.  What is it?
13     A.  This is application for employment.
14     Q.  On the application at the bottom -- I am
15 reading -- it says, "List other training
16 qualifications and skills such as drafter,
17 apprenticeship, languages, typing, et cetera." Do you
18 see where I am reading?
19     A.  There it is, yes.
20     Q.  What did you write in, if that is your
21 handwriting?
22     A.  Spanish.
23     Q.  And what does that whole block read?
24     A.  I'm sorry. Electric apprentice, Spanish and

Page 77

1  basic computer.
2      Q.  During your interview Mr. Roehonan asked you
3  whether you speak Spanish?
4      A.  Yes. I told him about that I am Spanish and
5  all that. That's where I came in, so. Yeah, I know
6  he pointed it out on something. I couldn't remember
7  exactly what it was, but.
8      Q.  He asked you to speak a few words of Spanish?
9      A.  Yes.
10     Q.  Which he apparently didn't understand?
11     A.  Yes.
12     Q.  Okay. What position were you eventually hired
13 for?
14     A.  Picker and packer.
15     Q.  Was that the position that you held throughout
16 your employment?
17     A.  No. I believe it was like a week or two after
18 I was hired I was bumped -- a term they use there --
19 onto the night shift dock.
20     Q.  So what did you start on?
21     A.  What did I start on? Oh. I started on
22 picker/packer for a week or two. Then I was bumped to
23 the dock. The dock, we pushed the loaded cages and
24 boxes and all the items into the tractor-trailers.

A10

Petrocelli
Dino G. Petrocelli, Volume 1

v.
C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 8, 2005

Page 78

1  Q.  How long did you work on the dock?
2  A.  It was over a year.  I think maybe a year and a
3  half, something like that.
4  Q.  That was on the night shift?
5  A.  Yes.
6  Q.  Was your initial few weeks as picker/packer on
7  the night shift as well?
8  A.  Yes.
9  Q.  So you always worked the night shift?
10  A.  Yes.
11  Q.  I assume when you say bumped to the dock that
12  that meant — is that a term having to do with the
13  union?
14  A.  Seniority.  Someone with more seniority that
15  was on the dock seen that I was out there and kind of
16  put in the seniority to push me onto the dock, so.
17  Q.  I take it that's a pretty common happening in a
18  union environment?
19  A.  Yes.
20  Q.  So that is not something that angered you at
21  the time or anything?
22  A.  No.
23  Q.  Something that you understood?
24  A.  Yes.

Page 79

1  Q.  What was your starting pay when you were hired?
2  A.  I think it was $13.75 an hour or something like
3  that.
4  Q.  Did it stay $13.75 an hour when you moved from
5  picker/ packer to the dock?
6  A.  I believe it was a 3 percent increase because
7  of the shift difference because I was on third shift
8  on the dock.
9  Q.  Oh.  I thought you had said you always worked
10  the night shift?
11  A.  It is the night shift.
12  Q.  Can the "night shift" mean more than one thing?
13  A.  Yes.
14  Q.  What was the first kind of night shift that you
15  worked as picker/packer?
16  A.  The first night shift as picker/packer was 3:30
17  to 12:00.  Then when I was bumped onto the dock, I
18  think it started from 5:00 — actually it started at
19  5:00, but then it ended up being at 7:00 o'clock we
20  came in, 7:00 to 3:30.  I think initially it was from
21  5:00 to 1:30 or something like that.
22  Q.  That would have been the shift that you worked
23  for that year or so that you worked on the dock?
24  A.  Yes.

Page 80

1  Q.  During that time, you said you started at
2  $13.75, I believe, and then, a roughly 3 percent
3  increase when you got bumped to the dock?
4  A.  Yes.
5  Q.  Because of the shift differential?
6  A.  Actually I think we made less on the dock, but
7  we had a shift differential because it was on third
8  shift.
9  Q.  So your pay at that time would have been
10  slightly more than $13.75 maybe?
11  A.  Yes.
12  Q.  Were you satisfied with your starting pay?
13  A.  Yes.
14  Q.  At what point did you move from the dock night
15  shift?
16  A.  I know I was on the dock for over a year.
17  Maybe about a year and a half.  I think I might have
18  moved one, one of the springs, the spring after I was
19  hired or something like that or maybe — see, I was
20  hired in May.  I think it was before the holidays of
21  that 19 — '98, I think.
22  Q.  In the spring of 1998?
23  A.  No.  I believe it was in the winter holidays of
24  1998.  Like around November, December.  Something like

Page 81

1  that.
2  Q.  If I understand correctly, you started working
3  for the company in May of 1997?
4  A.  Yes.
5  Q.  And in December of 1998, where did you move?
6  A.  To the picker/packer position again.
7  Q.  Which is what you'd started at?
8  A.  Yes.
9  Q.  Did you have a change in pay at that time as a
10  result of the switch?
11  A.  I think there might have been an increase in
12  pay because it was, you know, after September, you get
13  an increase in pay.
14  Q.  Do you remember what you were making when you
15  moved back to picker/packer?
16  A.  No, I don't remember exactly, no.
17  Q.  Roughly?
18  A.  Maybe 90 cents more.  So maybe $14.60 or
19  something like that.
20  Q.  This may be a difficult question.  But did you
21  have one supervisor during your employment?
22  A.  One supervisor for the dock.  And then when I
23  was a picker/packer, I think it was three.
24  Q.  So on any given shift, there would be, as a

21 (Pages 78 to 81)

A11

Petrocelli
Dino G. Petrocelli, Volume 1

v.
C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 8, 2005

Page 82

1   picker/packer, three supervisors?
2   A.  Yes.
3   Q.  Did that change every night or was it always
4   the same?
5   A.  That was always the same, as I can recall.
6   Q.  Who was your supervisor when you were on the
7   dock?
8   A.  I think it was Audra Jarman.
9   Q.  So if I understand correctly, she would have
10  been the only supervisor on a given shift for the
11  dock?
12  A.  No.  I think at that time there was two --
13  there was also a Mike -- I can't remember Mike's name.
14  He moved to Dallas.
15  Q.  So Audra Jarman and Mike something?
16  A.  Yeah.  Mike -- I can't remember.  I'm sorry.
17  Q.  That's all right.  Did you get along all right
18  in terms of a relationship with Audra Jarman and Mike
19  blank?
20  A.  Yes.
21  Q.  Did you have any altercations with them in
22  terms of discipline during that time?
23  A.  No.  As far as the dock work?  No.
24  Q.  Were you ever disciplined when you were working

Page 83

1   on the dock?
2   A.  No.  Not that I recall.
3   Q.  You don't recall receiving any discipline when
4   you worked on the dock?
5   A.  No.  Not as a -- maybe as a group, you know,
6   because the guys were getting restless and cranky, you
7   know, working them hours.  I think there might have
8   been a few disputes as far as the workload or
9   something like that, but ...
10  Q.  So you got along pretty well with Audra Jarman
11  and Mike?
12  A.  Yes.
13  Q.  Did you respect them as supervisors?
14  A.  Yes.
15  Q.  Then when you switched back to picker/packer,
16  who would have been your supervisors then?
17  A.  I think it was Steven Gwen, David -- I can't
18  remember his last name -- and --
19  Q.  I'll make a suggestion.  If it might be right.
20  I'm not sure.  Was it David Petrous, maybe?
21  A.  No.
22  Q.  No.  Okay.
23  A.  I can't remember his name.  I'm sorry.
24  Q.  That's okay.

Page 84

1   A.  My mind is scrambling.  Nate Huggins.
2        Are you talking about through the years
3   or?
4   Q.  As best you can remember.
5   A.  Lori.
6   Q.  Lori something?
7   A.  Dave Petrous was one of my supervisors through
8   the years.  Gary Simpers.  Diane Callahan, I believe
9   her name was.  Cary something.  I can't remember
10  Cary's last name.  She was only there for a few --
11  maybe less than a month.  Rob Pisani.
12  Q.  Was that Rob or Bob?
13  A.  Rob -- Bob.  Yeah, Bob Pisani.  Tammy -- I
14  don't remember her last name.  Tammy.
15       There's been a few.  I can't recall all of
16  them, but --
17  Q.  This is a pretty good list, though?
18  A.  Yeah.
19  Q.  Okay.  You said when you worked as a
20  picker/packer, you would have had -- or there would
21  have been, roughly, three supervisors per night -- per
22  shift?
23  A.  Roughly, yes.  For the packers and two for the
24  dock.

Page 85

1        There was another.  Gary Matthews, I
2   believe.  No.  It wasn't Gary.
3   Q.  Might it have been William?
4   A.  William?
5        MS. REESE:  Glen.
6   A.  Glen.  That's it, yeah.  Glen.
7   Q.  Give me an idea of the responsibilities of a
8   picker/packer.
9   A.  The responsibilities of a picker/packer, you
10  would get, basically, a work order, which is stickers.
11  Take the stickers, go to the product.  Make sure you
12  check the numbers and all that.  Make sure the part
13  numbers are the same numbers on the ticket.  Get the
14  ticket.  You stick it on either a box or bag or pack
15  it yourself in a bag.  Sometimes they're small.
16  Sometimes they're large.  And take those items to
17  either a cage or a tote.  Pack them into the cage or
18  tote.  And then prepare them to be shipped off to the
19  distributors.
20  Q.  I think I know what a cage is.  What do you
21  mean when you say "tote"?  Is it like a bag?
22  A.  A tote is like a small box with a lid that pops
23  open.
24  Q.  How many different work orders would you work

A12

22 (Pages 82 to 85)

Petrocelli                                v.                    Chrysler Corporation
Dino G. Petrocelli, Volume 1        C.A. # 04-CV-943-KAJ              August 8, 2005

Page 86

1  off of a night or did you just have one work order at
2  the beginning of a night?
3     A.  There was a few per night.  Different every
4  night.  Depending on, you know, the work, you know,
5  load.  As far as the workload goes.
6     Q.  Describe a typical day or night for me working
7  at the PDC.
8     A.  Well, you would punch in.  You would have a
9  meeting in the beginning of the day.
10    Q.  Was the meeting with all of the supervisors or
11 just one --
12    A.  It's with the whole, everybody that is working
13 that shift.
14    Q.  Pickers --
15    A.  Pickers.
16    Q.  -- and dock workers?
17    A.  Dock wouldn't be there yet, no.  You would have
18 a general meeting of five or ten minutes.  You get
19 your work bug.  The little cart you drive.  You get
20 the bug is what they called it.  It's like a towing
21 cart.
22    Q.  Does every picker/packer have a cart or a bug?
23    A.  Yes.  Then you would pick up your tickets,
24 which was mainly in a box and go out and pick.  And

Page 87

1  just keep doing that throughout the night.
2     Q.  Did you get to select what your assignments or
3  was it just first come, first served or how does that
4  work?
5     A.  Well, you had a large -- when I first started,
6  I think they just had everything spread out on the
7  table and everybody just grabbed what they were going
8  to work on.  They split up the sheet metal and the
9  larger items with a couple guys in the back.  And all
10 the other items in the general warehouse area would be
11 the majority of the pickers doing that work.
12    Q.  When you first started working as a
13 picker/packer that second time after the dock work,
14 who were your coworkers that you considered your
15 friends at work?
16    A.  Ryan Fellon.  Stuart Freeman.
17    Q.  Freeman?
18    A.  Yes.  Alan McGeough.
19    Q.  Alan?
20    A.  Yes.
21    Q.  McGeough?
22    A.  Yes.  Pat Palmer.  Anthony Bailey.  Kara and
23 Kevin Jones.
24    Q.  Kara and Kevin Jones?

Page 88

1     A.  Yes.  Joe Saucerman.
2     Q.  How do you say his last name?
3     A.  Saucerman.  Mark Christmas.  I think that would
4  be most of them, I think.
5     Q.  Did you socialize with those folks outside of
6  work?
7     A.  Yes.
8     Q.  You enjoyed them and considered them friends?
9     A.  Yes.
10    Q.  Did you respect them?
11    A.  Yes.
12    Q.  Were you a member of a union?
13    A.  Yes.
14    Q.  Is everyone who works at the Newark PDC a
15 member of a union?
16    A.  Everyone excluding the supervisors, I believe.
17 And management.
18    Q.  So all the picker/packers are?
19    A.  Yes.
20    Q.  And the union is the UAW?
21    A.  Yes.
22    Q.  Explain to me who it is on a given shift that
23 you would contact if you had a concern from your
24 union.  Who in your union would you contact?

Page 89

1     A.  The committee man.
2     Q.  The committee man is what it is called?
3     A.  Yes.
4     Q.  Who was that person?  And I realize it was
5  maybe different people?
6     A.  Yes.  Gary Meinhaldt.
7     Q.  Meinhaldt?
8     A.  Mm-hmm.  Pat Palmer.  Justin Mikulsky.  That's
9  about who I can recall.
10    Q.  Just so I can get a better understanding.  Were
11 there several committee men at the same time that
12 worked different shifts or was there just one per
13 period of time?
14    A.  There were several for each shift.  And then if
15 someone was out, then the other guy would cover.
16    Q.  Who would you say was your committee man most
17 often?
18    A.  Gary Meinhaldt.
19    Q.  Did you enjoy being a member of the union?
20    A.  Yes.
21    Q.  Prior to working for Chrysler Corporation, were
22 you a member of a union for any other employer?
23    A.  No.  Well, we started a union with the Linens
24 of the Week.  They started a union there, but it

A13

23 (Pages 86 to 89)

Petrocelli
Dino G. Petrocelli, Volume 1

v.
C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 8, 2005

Page 90

1 wasn't very long after that union started that I got
2 out.
3    Q.  What did you like about working for a union,
4 working in a union environment and with the union?
5    A.  Technically, I mean, I like the point that they
6 can represent you, you know.  If somebody can't speak
7 for themselves in a situation, or whatever, they can
8 speak for you, kind of like represent you between --
9 your relationship between management and employer or
10 employee.
11         I like what the union stands for, you know
12 what I mean as far as family and unity with family,
13 and secure lifestyle and all that.  I mean, it's not
14 exactly the union it used to be, but.
15    Q.  Are you currently a member of a union?
16    A.  No.
17    Q.  Did you work well with the committee man for
18 the union, Gary Meinhaldt?
19    A.  At times.
20    Q.  At times you worked well with him and I assume
21 at times you did not?
22    A.  Well, I think he could have done a lot better
23 job than he did.  Actually, I think most of them could
24 have.

Page 91

1    Q.  What did you consider something he could have
2 done a better job on?
3    A.  Well, I mean, not looking at everything at one
4 side, have different perspectives of a situation and
5 not leaving people out to dry.  Basically, a lot of
6 situations I felt that I was kind of on my own.  I
7 just wish it was just better representation.
8    Q.  Did you find Gary Meinhaldt easy to deal with?
9 Was he easy to talk to?
10    A.  Yes.
11    Q.  He was approachable?
12    A.  Yes.
13    Q.  What about Justin Mikulsky?
14    A.  Yes.
15    Q.  Easy to talk to?
16    A.  Yes.
17    Q.  Did you think he did a good job as a committee
18 man?
19    A.  Yes.  I think he did a good job, a very good
20 job.
21    Q.  The other person you mentioned was?
22    A.  Pat Palmer, I think.
23    Q.  Pat Palmer.  Did you get along with Pat?
24    A.  I think he did pretty good.  Basically, I think

Page 92

1 all of them did the best they could in their power.
2 They were allowed so much leeway as far as their
3 positions good.  I think they did pretty good.  They
4 could have probably been a little bit better.  There
5 is always room for improvement.
6    Q.  They were all approachable?  You felt like you
7 could talk to them?
8    A.  Yes.
9         MS. PAGE:  I think we'll take a break to
10 change the tape.
11         THE WITNESS:  Okay.
12         THE VIDEOGRAPHER:  Going off the record at
13 approximately 7:06
14         - - - -
15         THE VIDEOGRAPHER:  We're back on the
16 record at approximately 7:25 p.m.
17 BY MS. PAGE:
18    Q.  Before the break, Mr. Petrocelli, we were
19 talking about your work with DaimlerChrysler.  And I
20 wanted to ask:  During that time did you ever have
21 occasion to work overtime?
22    A.  Yes.
23    Q.  Was overtime offered pretty readily?
24    A.  Yes.

Page 93

1    Q.  And was available most of the time?
2    A.  There was sort of a mandatory hour.  They tried
3 not to push it too much, but yeah -- generally, yeah,
4 it was offered enough.
5    Q.  Did you ever work overtime?
6    A.  Yes.
7    Q.  Did you work a lot of overtime?
8    A.  Yes.
9    Q.  Compared to your coworkers, would you say that
10 you worked a lot of overtime?
11    A.  Yes.
12    Q.  Did you ever date anyone that you worked with
13 at the Newark PDC?
14    A.  Yes.
15    Q.  Who was that?
16    A.  Shannon Logan.
17    Q.  Is she the only person that you dated at work?
18    A.  Yes.
19    Q.  I assume you are no longer dating Shannon
20 Logan?
21    A.  No, I'm not.
22    Q.  How long did you and Shannon date?
23    A.  I wouldn't really consider it dating.  It was
24 just, basically, we worked together and hung out

A14

Petrocelli                                          v.                        Chrysler Corporation
Dino G. Petrocelli, Volume 1              C.A. # 04-CV-943-KAJ                        August 8, 2005

Page 94
1  together after work and stuff.
2      Q.  How long did you work together and hang out
3  together after work?
4      A.  Okay.  Maybe -- probably close to a year, I
5  guess.
6      Q.  Was that all during the time when you both
7  worked for DaimlerChrysler?
8      A.  Yes, that's correct.
9      Q.  Did you both work on the same shift, the second
10  shift?
11      A.  Yes.
12      Q.  During the whole time that you were hanging out
13  together?
14      A.  Yes.
15      Q.  Did you ever have any problems being that you
16  worked in the same work environment?
17      A.  No.  We both did our jobs, I mean.  We just
18  took breaks together.  That was it.
19      Q.  Speaking of taking breaks, I assume at some
20  point in any given night you would have a break for a
21  meal, like -- would it be called lunch?
22      A.  Yeah.  Well, technically, yeah.
23      Q.  What time would you usually go to lunch?
24      A.  I think it was 8:30.

Page 95
1      Q.  Did the picker packers go to lunch in shifts or
2  did everyone have lunch at the same time?
3      A.  Everyone had lunch at the same time.  Well,
4  they had different shift starting times.  So it would
5  vary within an hour or so.
6      Q.  So for the shift that you would have started
7  with, you would have lunch together?
8      A.  8:30.  Yes.
9      Q.  How many people would that have been, roughly,
10  on any given night?
11      A.  Maybe 30 or something.
12      Q.  Where did you all have lunch?
13      A.  In the warehouse, McDonald's, the pizza shop
14  down the street.
15      Q.  So you would sometimes leave the building?
16      A.  Yes.
17      Q.  How much time did you have for lunch?
18      A.  A half hour.
19      Q.  You said that most of the time you had --
20  actually I might be misstating.  Did you have lunch
21  with Shannon during that time when you guys were
22  hanging out together?
23      A.  Yeah.  There were a few times we had lunch
24  together, yes.

Page 96
1      Q.  And you took your breaks together, you said?
2      A.  Yes.  Not all of them, but, you know, when we
3  had a chance to take a break together, we did.
4      Q.  Did Shannon Logan ever live with you or did you
5  live with her?
6      A.  I might have stayed -- I stayed over her
7  mother's house for a little while, but not very long.
8      Q.  When you say stayed over, did you mean like
9  occasionally at night or you moved some things over
10  there, like your possessions?
11      A.  Just occasionally.
12      Q.  Did you and Shannon Logan have a sexual
13  relationship?
14      A.  Yes.
15      Q.  Did you ever have sexual relations at work?
16      A.  No.
17      Q.  You never had sex on the campus of --
18      A.  No.
19      Q.  -- Chrysler Corporation?
20      A.  No.
21      Q.  Did you ever kiss while you were on the campus
22  of Chrysler Corporation?
23      A.  No.
24      Q.  Never kissed each other?

Page 97
1      A.  No.  Not -- maybe outside in the parking lot,
2  but not inside, no.
3      Q.  Did you ever hug?
4      A.  No.
5      Q.  To your knowledge, did she file a complaint of
6  any type with DaimlerChrysler?
7      A.  Yes.
8      Q.  What was that complaint about?
9      A.  Sexual harassment.
10      Q.  How do you know about her complaint?
11      A.  I think her sister told me that she had got
12  some kind of settlement or something from it.
13      Q.  So Shannon herself did not tell you about it?
14      A.  No.
15      Q.  Were you seeing each other at the time that she
16  made the complaint?
17      A.  I believe so, yes.
18      Q.  But she didn't tell you about it?
19      A.  Yeah, she told me about it, but, I mean, it
20  wasn't like -- she didn't tell me about the settlement
21  or anything like that.
22      Q.  Let's try to pin down the time period when you
23  guys were -- you and Shannon were seeing each other or
24  hanging out together.

A15

25 (Pages 94 to 97)

Petrocelli
Dino G. Petrocelli, Volume 1

v.
C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 8, 2005

Page 102

1    A.  No.  She just said she got a settlement.  That
2    was it.  Usually when somebody says they got a
3    settlement, you know, to me -- I didn't go into
4    details.  It's really none of my business.
5    Q.  You were still seeing Shannon at the time she
6    got her settlement?
7    A.  No.
8    Q.  That was after you were incarcerated that she
9    got her settlement?
10   A.  I believe so, yes.
11   Q.  And you have never talked to her about any type
12   of settlement?
13   A.  No.
14   Q.  So you don't know whether she got a money
15   settlement?
16   A.  No.  But I'm pretty sure she did.  I don't know
17   definitely or anything like that, no.
18   Q.  Did you ever get in trouble, get written up,
19   that kind of thing for spending time with Shannon
20   while you were at work?
21   A.  I guess you can put it that way, yes.
22   Q.  Well, how would you put it?
23   A.  Taking my break and she's just there.  And I
24   would put it as harassment is, basically, how I would

Page 103

1    put it.
2    Q.  What specifically did you get disciplined for?
3    You were just having lunch and she was there and you
4    got disciplined, or?
5    A.  I think it was loafing or something like that.
6    They put something that couldn't really be proven,
7    like loafing or wasting company time or something like
8    that.
9    Q.  As I understand your testimony, that happened
10   during times when you were on a break and a supervisor
11   just came up to you while you were on a break and said
12   you were loafing and wrote you up?
13   A.  Yeah.  Actually there's been occasions when I
14   was on break when I was written up for taking
15   excessive breaks and stuff.
16   Q.  That makes a little sense to me, to get written
17   up, if you were on break, to get written up for
18   excessive breaks.
19   A.  It makes sense to me, but it wasn't the case.
20   Q.  You said there were occasions, if I understand
21   correct, where you were on break with Shannon and you
22   got written up for leaving while you were on a break?
23   A.  Yeah.
24   Q.  How many times did that happen?

Page 104

1    A.  Actually, a few times it was brought to our
2    attention when I was picking sheet metal or something
3    like that.  They would ask her what she's doing back
4    there and stuff like that because there were
5    certain -- you know, three different break rooms.
6    Q.  Mm-hmm.
7    A.  She would be in the back break room.
8    Q.  Would that have been unusual for any reason?
9    A.  No.  Because there is no particular place where
10   everybody takes break.  It always seemed to be
11   questionable as far as, you know, where we took our
12   breaks and all that stuff.
13   Q.  Who disciplined you for leaving while you were
14   taking a break?
15   A.  I believe it was Audra Jarman.
16   Q.  Was this during the time when you were a
17   picker/packer or when you were a dock worker?
18   A.  A picker/packer.
19   Q.  So Audra was sometimes your supervisor when you
20   were a picker/packer as well as on the dock?
21   A.  Yeah, they switched her from dock to
22   picker/packer.  They moved the supervisors around a
23   lot.
24   Q.  Is Audra the only person who wrote you up for

Page 105

1    loafing when you were taking breaks or were there
2    others?
3    A.  No.  Basically, her for taking breaks, yes.  I
4    was written up for loafing before when I wasn't taking
5    breaks, when I was working.
6    Q.  But just sticking with this idea of you're
7    taking a break and then someone just writes you up.
8    That was just --
9    A.  Audra, yeah.
10   Q.  -- Audra.  Did Audra say anything when she
11   wrote you up for just taking a break?
12   A.  No.  She was a woman of few words.
13   Q.  She would just come over and hand you a slip of
14   paper?
15   A.  She would walk through the break room, write up
16   a slip, and that was it.  She didn't talk very much.
17   Q.  Was it possible that Audra was writing you up
18   because she felt like you were taking too long of a
19   break?
20   A.  There was no possibility of me taking a -- I
21   always made sure I had a 15-minute break and that was
22   it, you know.
23   Q.  And she never explained to you why she was
24   giving you a piece of paper; she just handed it to

A16

27 (Pages 102 to 105)

Petrocelli
Dino G. Petrocelli, Volume 1

v.
C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 8, 2005

Page 106

1  you?
2      A.  No.  She would call me in after I was already
3  written up suspend me and all that right at the same
4  time.
5      Q.  She never gave you any explanation other than
6  you are loafing?
7      A.  She didn't talk very much.
8      Q.  So if I —
9      A.  I mean -- I wish there was more communication,
10  but there wasn't.  Most of the time I was out the
11  door, I didn't know why I was out or reasons for any
12  of that.  I guess you wouldn't really know unless you
13  knew Audra, so.
14      Q.  So just to be clear, she would never tell you
15  why she was writing you up?
16      A.  She wouldn't even tell me she was writing me up
17  until after the fact.
18      Q.  And there was never any explanation with it?
19      A.  Maybe in her paperwork or something like that,
20  she might have written something on that, yeah.
21      Q.  Did you ask Audra why she was writing you up on
22  those occasions?
23      A.  Oh, yes.
24      Q.  What was her response?

Page 107

1      A.  Because you took excessive break or you took
2  too long a break, and stuff like that.
3      Q.  So she did give you an explanation about why
4  she was writing you up?
5      A.  After the fact, yes.
6      Q.  When you asked, she responded?
7      A.  Yes.  But prior to me asking, no, I didn't
8  know.  And I always made sure that I have my 15
9  minutes.  I never took any excessive breaks or any of
10  that kind of stuff.  Because I knew the situation that
11  I was in.  I didn't want to lose my job.
12      Q.  Who else in terms of supervisors disciplined
13  you while you were an employee of DaimlerChrysler?
14      A.  Glen Matthews and Gary Simpers, Dave Petrous.
15  I believe Steven Gwen.
16      Q.  Do you remember the specifics of any of the
17  discipline that they imposed on you?
18      A.  Well, most of them were for loafing, again, the
19  same loafing thing, which I really can't explain as
20  far as my job was and all that.  I wasn't loafing.
21  Put it that way.  I mean that was just the easy way
22  to kind of like put me in as far as misconduct and a
23  violation because, like I said, I was walking on egg
24  shells trying to prevent the discharge that I ended up

Page 108

1  having anyway.  Loafing is the easiest thing you can
2  say somebody did.
3      Q.  Did you ever complain or raise an issue with
4  your committee man regarding discipline?
5      A.  Yes.
6      Q.  What resulted from that complaint?
7      A.  Actually, some of the write-ups were thrown out
8  at times because it was seen that I was basically
9  being harassed.
10          I remember one occasion Justin Mikulsky
11  helped me out of a situation where I was a sheet metal
12  picker.  Before we start, we break our tickets up.  We
13  go to the table -- all the sheet metal workers do it,
14  go to the table, break down the tickets, and then put
15  them in order and all that.  Well, I was there with
16  all the other sheet metal workers sitting there, but I
17  got written up for taking excessive breaks again.
18  Justin fought that because he knew what the
19  requirement for work was, to break the tickets up.
20  And everybody else was there.  So it was, basically,
21  harassment on their part.
22      Q.  Did you feel at the time that you were being
23  harassed?
24      A.  Yes.

Page 109

1      Q.  Why did you think you were being harassed or on
2  what basis?
3      A.  I think, basically, they wanted to make an
4  example out of me.  I'm, you know -- I don't have any
5  cousins or uncles or neighbors or anybody else working
6  there, and I think -- I believe there is a lot of
7  nepotism that goes on there, so.
8      Q.  So you feel that you were harassed because you
9  didn't have any other family or relatives or anything
10  working there?
11      A.  I think it was, basically, because of the
12  nepotism, they wanted to secure their family and
13  friends' jobs and get rid of the guys that don't have
14  nobody there, you know, and make an example of them,
15  you know, because they weren't doing what they should
16  have been doing.
17      Q.  Did you report this concern about nepotism to
18  human resources or to the AEP person?
19      A.  To the committee man.
20      Q.  Just to the committee man?
21      A.  I might have mentioned it to the supervisors,
22  but, nothing, no, nothing in paper, no.
23      Q.  Any other concern that you had about why you
24  were being harassed or why there was this apparent

A17

28 (Pages 106 to 109)

Petrocelli
Dino G. Petrocelli, Volume 1

v.

C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 8, 2005

Page 110

1  focus on you?
2  A. Oh, yeah. I had a lot of concerns. My whole
3  lifestyle I changed. I mean, I started to feel
4  depressed because I didn't know what I was doing
5  wrong, you know, work-wise. This was happening no
6  matter what I did. It seemed like every month and a
7  half or months to I was out the door again on the same
8  loafing thing or wasting time, stuff like that. I
9  felt it was unjust. All I wanted was a chance to you,
10  know, make a living. That was it.
11  Q. Was there a reason why you didn't report this
12  nepotism concern to the company, to a EAP person or to
13  HR?
14  A. Because it goes on with the management, too.
15  They have their family and friends and everybody else
16  is there, too.
17  Q. So you didn't report it based on your thought
18  that they also had nepotism tendencies?
19  A. Well, I didn't want retaliation or anything
20  like that. I didn't want my situation to get any
21  worse than it was.
22  Q. Had you ever reported anything to HR or to EAP
23  before or at any point?
24  A. To EAP I have, yeah. They expressed that,

Page 111

1  yeah, okay, blah, blah, and they give me a 1-800
2  number and that was the extent of it.
3  Q. Did you call the 1-800 number?
4  A. Yeah. For counseling.
5  Q. Did they assist you?
6  A. Not really, no. I mean.
7  Q. When you say "not really," what do you mean?
8  A. Well, there was nothing there to really help me
9  with my situation. Just the counseling that I was
10  going through after the fact where I was getting
11  involved in the alcohol and the drugs. And as far as
12  that, there was nothing that could help me. I needed
13  to, you know, how -- like everything else, you have to
14  be in deep, knee deep in it to get somebody to pull
15  you out.
16  Q. So you hadn't had an experience of reporting
17  something to HR and being retaliated against; you just
18  thought that would happen?
19  A. Well, I mean, basically, I was in a bad
20  situation. I had a target on me. And I didn't want
21  to put any more heat on me at all. I was told by Glen
22  Matthews that Bob Mayhew told him to get me and
23  Shannon out the door; no matter what it takes, get
24  them out the door; I want them out. That's when the

Page 112

1  suspension came in -- or the write-up came in for the
2  tickets I was talking about for the sheet metal
3  because they were just looking for something to push
4  me out the door with. I seen what extent these people
5  were going to to get me out. I didn't want to push it
6  any further, you know. I wanted to keep my job.
7  Q. So just to be clear, you never reported any of
8  your concerns to HR?
9  A. To EAP, mostly.
10  Q. You did report it to EAP?
11  A. Yes.
12  Q. On how many occasions?
13  A. Maybe three.
14  Q. What did you report to them?
15  A. The stress I was going through at work, you
16  know, the feeling like they were following me and
17  harassing me, and my involvement with alcohol and the
18  drugs, that I needed help, that I wanted them to help
19  me in the situation because I was feeling desperate.
20  I didn't want to lose my job. You know, stuff to that
21  extent.
22  Q. Just a moment.
23  A. It was really frustrating for me, you know.
24  People are sitting doing crossword puzzles and playing

Page 113

1  cards and all that, and I'm the one getting written up
2  for loafing. That's why I felt tense and harassed
3  because I wasn't doing half of what the other people
4  were doing, but I was the one getting the bite.
5  MS. PAGE: Can I get this marked as
6  Exhibit 2?
7  (Petrocelli Deposition Exhibit No. 2 was
8  marked for Identification.)
9  BY MS. PAGE:
10  Q. Mr. Petrocelli, I handed you what's been marked
11  as Exhibit 2. If you will see at the bottom, it bears
12  the number D 000001 Do you see that number at the
13  bottom?
14  A. Yes.
15  Q. Do you recognize this document?
16  A. Yes.
17  Q. Can you tell me what it is and describe it
18  generally?
19  A. Well, it's a policy that they probably handed
20  out at one of their meetings or something to briefly
21  go over, harassment, discrimination rules.
22  Q. Have you ever seen this document before?
23  A. I probably have. I can't recall. Yeah, I'm
24  pretty sure they probably have given me something like

A18

29 (Pages 110 to 113)

Petrocelli                                    v.                    Chrysler Corporation
Dino G. Petrocelli, Volume 1          C.A. # 04-CV-943-KAJ                August 8, 2005

Page 114

1  this. Not this same exact one, but maybe something
2  similar.
3     Q.  The policy runs from page D 000001 to D 000004.
4  On the next page following that with the title
5  "Standards of Conduct" —
6     A.  On the next page after?  Okay.
7     Q.  — it's labeled D 000005.  Do you recognize
8  that document?
9     A.  I can't say I do offhand, no, but it's probably
10  been handed out before.  I can't say personally I have
11  had it handed to me, but.
12     Q.  Just to confirm, we're looking at the same page
13  of Exhibit 2 that has the heading "Standards of
14  Conduct"?
15     A.  Yes, that's correct.
16     Q.  If I understand, you do recognize the document?
17     A.  I am saying that it could possibly have been
18  handed out at a meeting or something like that.  But I
19  can't recall me personally having a copy of this.
20     Q.  Looking again at the first part of Exhibit 2,
21  titled "DaimlerChrysler Corporation Policy," on the
22  second page of that part labeled D 000002, at the top,
23  there is a section entitled "Reporting a Complaint."
24  Could you read that entire section to me, please?

Page 115

1     A.  "Anyone who believes that he or she has been
2  subjected to or witnessed activity of behavior in the
3  workplace that violates this policy should make
4  DaimlerChrysler aware of such conduct.  Notification
5  should be made to DaimlerChrysler Corporation's
6  diversity and work life office, the local human
7  resources office or management.  Employees covered by
8  collective bargaining agreement are also encouraged to
9  use mechanisms provided under the terms of the
10  applicable agreement."
11     Q.  Thank you.  When you were working at
12  DaimlerChrysler and at the time that you were
13  experiencing the stress you were talking about,
14  feeling you were being targeted, were you aware of
15  this policy?
16     A.  No.  I can't say I was, no.
17     Q.  You don't recall ever seeing this document or
18  have anyone explain it to you?
19     A.  No.  Not that I recall, no.
20     Q.  Do you recall ever participating in a training
21  session regarding harassment and discrimination and
22  how it should be dealt with?
23     A.  I remember being at a few, but I can't say
24  exactly if I have at this particular one or not.

Page 116

1     Q.  So is this — regardless of whether you feel
2  you've seen this document, is this new information for
3  you that I am sharing today or were you aware that you
4  should report complaints in this way?
5     A.  I guess you would say it's new to me.  I would
6  consider management and human resources.  But as far
7  as this phone number and the name of the
8  diversity — you know, the diversity and work life
9  office, I didn't know anything about that.
10        EAP, I made attempts.  Management, like I
11  said, I really couldn't make attempts there because
12  there was nepotism in that part of the plant, too, so.
13  I really didn't feel like I had anybody who I could
14  confide in that would actually resolve the situation
15  because I was going out there telling people and
16  nothing was happening.  I was still going through the
17  same thing.
18     Q.  You say you were going out there telling people
19  but still going through the same thing.  Who were you
20  telling?
21     A.  The union, EAP, counselors, anybody that could
22  help me.  What do I do, basically?  But as far as this
23  number here, I didn't know this number here.
24     Q.  So you called EAP and you spoke with your

Page 117

1  committee man, but you did not otherwise report the
2  harassment that you were feeling to DaimlerChrysler or
3  to HR —
4     A.  Oh, yeah, I have reported it.
5     Q.  — or to management?
6     A.  I have reported it.
7     Q.  I'm sorry.  Please tell me when you reported
8  it.
9     A.  As far as the harassment that I was getting
10  from other employees or whoever it was that was making
11  the depictions of me in the bathroom, yeah, I reported
12  that kind of stuff.
13     Q.  You reported that to whom?
14     A.  As far as the disciplinary — to the
15  management, to the union, EAP.  So all three, you
16  know, divisions of it.
17     Q.  Just so we're clear, I don't want to move on to
18  another topic until we finish this one.
19     A.  Oh, okay.
20     Q.  But I think we have been discussing how you
21  felt targeted —
22     A.  Yeah.
23     Q.  — or picked out for discipline?
24     A.  Mm-hmm.

A19                          30 (Pages 114 to 117)

Petrocelli
Dino G. Petrocelli, Volume 1

v.

C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 8, 2005

Page 118
1  Q.  And tell me again the basis on which you feel
2  like you were targeted or picked out?
3    A.  The basis that I feel?  I felt it was because
4  of my ethnicity is, basically, why I felt I was
5  harassed.  I was the only Hispanic hired there.  I
6  was, basically, hired because I spoke Spanish.  You
7  know, they wanted to make an example out of me.
8  That's how I see it.
9    Q.  You told me earlier that your concern and the
10  basis that you felt you were being targeted was
11  because of nepotism; that you didn't have anybody
12  working there?
13    A.  The nepotism ended up part of it, yes.
14    Q.  Was it an important part?
15    A.  I believe so.  I mean, I don't think anybody
16  was harassed as much as I was.
17    Q.  And you felt everybody else had friends or
18  family or something, some kind of connection?
19    A.  It's not I felt, I know because, i mean, the
20  people there, they were all related.
21    Q.  So everybody else that worked there besides you
22  had people they were related to at the company?
23    A.  Not everybody.  The majority of them, yeah.
24  They were either married through management.  They

Page 119
1  were married to each other.  They were neighbors of
2  the plant manager.  Fishing buddies, you know,
3  ex-governor's sons.
4    Q.  So you felt because you were outside of that
5  loop, you were being targeted?
6    A.  I felt because of my ethnicity because I was
7  Hispanic, basically.  This is just a small part of it.
8  There was a lot more to it than just the misconduct
9  and all that kind of stuff.  I, basically, was
10  targeted by everyone there, you know.  Not everybody,
11  but a majority of the people there.
12    Q.  Turning your attention again to this same
13  Exhibit 2 on page D 000005.  I believe you testified
14  earlier that you are not familiar with this document?
15    A.  No.  I am familiar with the Standards of
16  Conduct, but I can't say that I got this exact
17  document.  I think they might have modified them or
18  something.
19    Q.  But you are aware generally that
20  DaimlerChrysler has standards of conduct?
21    A.  Oh, yeah.  Mm-hmm.
22    Q.  When you were written up for various
23  disciplines, it usually said on there which standard
24  of conduct —

Page 120
1    A.  Yes.
2    Q.  — that they felt that you had violated.  Is
3  that correct?
4    A.  Yes, that's correct.  Number 5.
5    Q.  So it sounds like you picked that out pretty
6  quickly, that you are familiar with this listing of
7  the standards of conduct?
8    A.  No.  But I remember number 5 more than anything
9  because that really bothered me, that, they would say
10  I didn't perform normal effort on the job, wasting
11  time, loafing and then sleeping on the job.  That
12  really bothered me.  So that stands out, yeah.
13    Q.  You can just sit that right there.  We're done
14  with that for now.  Which supervisors do you believe
15  targeted you because of either nepotism or your
16  ethnicity?
17    A.  Well, see, I don't want to get off the subject,
18  but I did bring it up as far as the depictions and all
19  that that were being made of me on the job.  Nothing
20  was being done.  Every day there was a new drawing and
21  a new thing about me, you know, throughout the
22  workplace.  I made several complaints to all of the
23  supervisors.  It seemed like they were just letting it
24  go on and on and on.

Page 121
1    Q.  I understand.  And we'll certainly talk about
2  that in much greater detail.
3    A.  Yeah.
4    Q.  But focusing now just on discipline.  Which
5  supervisors do you feel disciplined you or targeted
6  you because of your lack of nepotism ties —
7    A.  Stephen Gwen.
8    Q.  Excuse me.  Let me finish my question.
9    A.  I'm sorry.
10    Q.  — your lack of nepotism ties or your
11  ethnicity?
12    A.  Steven Gwen.  He's made remarks to my
13  ethnicity, to my religion, and all that.
14    Q.  What is your religion now that you mention it?
15    A.  Catholic.  He was surprised I was Catholic.  He
16  thought I should practice sanataria or voodoo were his
17  words because I had a cross around my neck.
18    Q.  And are there any other supervisors that you
19  felt targeted you or harassed you because of your
20  ethnicity or your nepotism lack thereof?
21    A.  Audra Jarman.  Dave Petrous and Gary Simpers.
22    Q.  Is that all?
23    A.  Bob Mayhew.
24    Q.  Any others?

A20

31 (Pages 118 to 121)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Petrocelli
Dino G. Petrocelli, Volume 1

v.

C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 8, 2005

Page 130

1   A.  Yeah, I believe so.
2   Q.  No others?
3   A.  There may be others, but I can't recall at this
4   time, no.
5   Q.  This is the list of similarly situated
6   employees that you feel were treated better than you?
7   A.  That were treated better than me? I
8   misunderstood the question. I'm sorry.
9   Q.  What I am trying to get at is:  Are you
10  claiming that others were not disciplined as harshly
11  as you were for the same conduct? In other words,
12  people who were in your same position who committed
13  the same conduct you did but were not disciplined as
14  harshly?
15  A.  Yes.
16  Q.  Is that that list?
17  A.  No. I'm sorry. I misunderstood the question.
18  I apologize.
19  Q.  What is this list?
20  A.  That's the list of the people that I was
21  basically -- where they would have negative
22  conduct, you know, call me spic and mushroom-picker
23  and all that kind of stuff.
24  Q.  These are the people that you feel verbally

Page 131

1   harassed you?
2   A.  Yes.
3   Q.  Set that aside for a moment -- but we will come
4   back to it -- and talk about the list of folks that
5   you think were similarly situated.
6   A.  Okay.
7   Q.  To you.
8   A.  Okay. Now, you are saying that in the similar
9   situation that worked -- well, Sean Roehonan is one.
10  Q.  Mm-hmm.
11  A.  Larry Cerra. C-E-R-R-A, I believe. Al
12  McGeough. Liz, Elizabeth Brinkley. Mark Stollings.
13  Doug Feldman. Clarence Johnson. Another guy named
14  Larry. I don't remember his last name. Might be
15  Robinson. Larry Robinson. Something like that. He
16  had just started. What was his name? Sarge. I can't
17  remember Sarge's real name. Sarge. I don't know his
18  real name. I can't remember his real name.
19  Q.  Is that a complete list?
20  A.  Oh, yeah. Scott -- I have all these names
21  written down. I just can't remember them. Dan Zeno.
22       MS. PAGE:  We're going to pause a minute
23  to change the tape.
24       THE VIDEOGRAPHER:  Going off the record at

Page 132

1   8:21 p.m.
2              -  -  -  -
3       THE VIDEOGRAPHER:  Back on the record at
4   approximately 8:23 p.m.
5   BY MS. PAGE:
6   Q.  We were discussing a list of individuals that
7   you feel similarly situated to you, but did not
8   receive the same kind of discipline that you did -- in
9   other words, were treated better. On that list, I
10  have Sean Roehonan, Larry Cerra, Al McGeough, Liz
11  Brinkley, Mark Stollings, Doug Feldman, Clarence
12  Johnson, Larry -- we think his last name might be
13  Robinson -- a person named Sarge -- we don't know his
14  real name -- and Dan Zeno. Is that a complete list or
15  are there others?
16  A.  There's others. Ann Rodosheimer.
17  Q.  Say that again.
18  A.  Ann Rodosheimer. I don't know how to spell her
19  last name.
20       See, there was a few people that I'm
21  thinking off the top of my head they were playing
22  softball during work hours, and management knew about
23  it and everything, just told them to come inside,
24  never did anything about it, never disciplined them or

Page 133

1   nothing. So there is a group there. I can't really
2   recall all the names. It's been awhile since I've
3   worked there. I really didn't associate with
4   everybody. That's, to the best of my knowledge, a
5   good part of a group of people in that area, in that
6   group that you are talking about. As far as I can
7   recall right now, anyway. Because I have all that
8   stuff written down, but it's just, you know, I have
9   got so much stuff going on right now, that it's like
10  moving around in there. I'm sorry.
11  Q.  Going down the list. The first one is Sean
12  Roehonan. What conduct do you allege that he was
13  engaging in that was similar to conduct that you
14  engaged in?
15  A.  Well, I think the conduct that he was engaging
16  in was actually more exaggerated. He would go in
17  there and be on E, Ecstasy, and stuff like that.
18  Q.  Pardon me?
19  A.  He would be doing drugs at work.
20  Q.  Did you say eating Ecstasy?
21  A.  Ecstasy. He's just a very odd person. A lot
22  of the stuff, it was obvious he was on drugs. He was
23  going around laughing and jumping.
24  Q.  You say it was obvious he was on drugs?

A21

34 (Pages 130 to 133)

Petrocelli
Dino G. Petrocelli, Volume 1

v.
C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 8, 2005

Page 134

1  A.  Yes.
2  Q.  Did you see him ingesting drugs?
3  A.  Yes.
4  Q.  At work?
5  A.  No, not at work.  I have seen him in public.
6  You know, I have gone out and I have seen him in
7  public.
8        At work, though, I have seen him with the
9  pills in his hand and all that, then see him, you
10  know, drugged up looking, jumping around and laughing,
11  saying that he did take drugs, actually telling
12  people.
13        But as far as me seeing him doing it, no,
14  I didn't actually see him do it, but just the
15  reactions he was making and his appearance to me was
16  like he was under the influence.
17  Q.  And is it -- are you also alleging that he
18  wasn't disciplined as a result?
19  A.  Yes.
20  Q.  Was he ever disciplined, to your knowledge?
21  A.  I am sure he probably had maybe one or two-day
22  suspensions, stuff like that, but not according to
23  what his violations were.
24  Q.  How is it that you are aware of all the

Page 135

1  discipline everybody else at the plant received?
2  A.  Well, because the situation I was in, I was
3  getting pushed out of the door, you know, every month
4  and a half, two months.  And I was working and seeing
5  all these people slacking off, doing crossword
6  puzzles, drinking, doing drugs, hanging out and
7  reading newspapers and all that.  I mean that,
8  bothered me.  Then when they finally did get in
9  trouble -- sleeping.  Actually some of them were
10  sleeping.  Some of them were breaking out early for
11  lunch, using crow bars to open doors and stuff like
12  that.  All the stuff that was going on there, and they
13  don't get any discipline.  And here I am trying to do
14  my job and keep my job, and I'm getting thrown out the
15  door all the time.  That's why, basically, it stood
16  out.
17  Q.  When you said they didn't receive any
18  discipline, are you exaggerating?
19  A.  They probably didn't receive the discipline
20  they should have received.  I think it was toned down
21  a little bit.  Maybe some of them might have been
22  disciplined a little more than others, but I think it
23  was, basically, favoritism as far as when the
24  discipline came in because it had to be done.  Because

Page 136

1  it was just general knowledge that these people were
2  screwing off and somebody had to be disciplined, even
3  if it's one or two-day suspensions, you know.  They
4  got some kind of something, I am sure.
5  Q.  You have accused some of these individuals of
6  doing drugs.  There was, I assume, during the same
7  period of time when you were doing cocaine in your
8  life?
9  A.  Yeah, before and during, yes.
10  Q.  Moving on to Larry Cerra.
11  A.  Yes.
12  Q.  What conduct did he engage in that was similar
13  conduct that you engaged in?
14  A.  Well, he slept on his equipment.
15  Q.  Did he receive discipline as a result?
16  A.  No.
17  Q.  Is it your testimony that he never received
18  testimony?
19  A.  I believe he never did, no.
20  Q.  Al McGeough, what conduct did he engage in that
21  was similar?
22  A.  Doing crossword puzzles and reading newspapers.
23  Q.  And did he ever receive discipline?
24  A.  No.

Page 137

1  Q.  Never?
2  A.  No.
3  Q.  Liz Brinkley?
4  A.  Sleeping and playing board games or something
5  like that.  I think she might have gotten one or two
6  days suspension.
7  Q.  Mark Stollings?
8  A.  The same thing.  That was her game board
9  partner.
10  Q.  Doug Feldman?
11  A.  Everything.  Sleeping on the job, breaking out,
12  smoking weed in the back of the warehouse, you know.
13  Everything, I guess.
14  Q.  Clarence Johnson?
15  A.  Loafing.
16  Q.  Larry maybe Robinson?
17  A.  Sleeping.
18  Q.  Sarge?
19  A.  Just slow.
20  Q.  Dan Zeno?
21  A.  The same thing with him.  I think he was on
22  drugs and a just really odd person.
23  Q.  Ann Rodosheimer?
24  A.  Loafing.

A22

35 (Pages 134 to 137)

Petrocelli
Dino G. Petrocelli, Volume 1

v.

C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 8, 2005

Page 138

1  Q.  It's your testimony that none of these people
2  received discipline or not?
3     A.  They might have received some discipline, like
4  I said, but I am not sure.  Up to now, they probably
5  have been fired, for all I know.
6     Q.  But at the time --
7     A.  But at the time, no, I didn't see the same
8  discipline as what I was receiving for, you know, for
9  working.
10    Q.  Were these people all picker/packers?
11    A.  Yes.
12    Q.  Any of them managers?
13    A.  No.
14    Q.  Did they all work on the same shift that you
15  did?
16    A.  Yes.
17    Q.  Let's talk a little bit about the -- you've
18  said you felt like you were harassed --
19    A.  Yes.
20    Q.  -- when you were at DaimlerChrysler.  Tell me
21  about that
22    A.  It seemed like everywhere I looked there was a
23  supervisor walking this way looking at me, over here
24  looking at me.  I went to drop my keys off to Shannon

Page 139

1  one time.  Gary Simpers wrote me up because I was out
2  of my work area, which the whole warehouse is a work
3  area.  I was just dropping off the car keys because we
4  were in her car during lunch.  Wrote me up for that.
5     Q.  During a time when you should have been
6  working?
7     A.  Well, I was working.  See, where the warehouse
8  is is a big, open space.  I was pulling around to go
9  to my work.  There she was in like an open area
10  between the racks.  Since I seen her right there, I
11  pulled up right in the main, you know, work area and
12  just handed her keys.  And that was it.  He pulled up
13  in front of me and asked what I was doing wrong.
14    Q.  Who was this again?
15    A.  Gary Simpers.
16    Q.  So, again, this is another discipline issue?
17    A.  Yes.
18    Q.  Any other discipline issues that we haven't
19  talked about that you wanted to raise before we move
20  on to harassment or the things you have characterized
21  as pictures and stuff?
22    A.  I think they were using the discipline
23  procedure, I think as a harassment.
24        I mean, like you said, the depictions and

Page 140

1  all that, I mean, just seeing that everywhere I worked
2  picking up equipment and seeing stuff right there in
3  front of me, that's harassment to me.
4     Q.  Let's talk specifically about, as you've said,
5  depictions.  Tell me about the depictions that you are
6  talking about.
7     A.  They would draw my face with a beard and all
8  and my name under there and saying, "Me no speak
9  English."  It would have a sombrero on it.  Or a jail
10  cell with a guy with a sombrero with my name on there,
11  I mean.
12    Q.  Where were these depictions?
13    A.  In the bathrooms, on the work equipment, out in
14  the work area on boxes.
15    Q.  So you are saying things were drawn on objects?
16    A.  Yes.
17    Q.  What were they drawn on there with?
18    A.  Markers.
19    Q.  Did you ever come to understand who did them?
20    A.  I never found out who did them, but I have a
21  pretty good idea, you know.  But I couldn't really say
22  who did them, no.
23    Q.  Who did you think did them?
24    A.  Well, there is a group of immature guys who

Page 141

1  worked there that did that kind of stuff all the time.
2  And, you know, I mentioned it to them, and they denied
3  it.
4     Q.  Did that kind of stuff all the time?  What do
5  you mean, to other people, or?
6     A.  I don't know.  All the bathrooms were marked up
7  with all kinds of junk, you know, sexual stuff and,
8  you know, sexually explicit drawings and just dumb
9  sayings, and just, basically, trashing the place.
10    Q.  So who was this group?  Who was in this group?
11    A.  Dan Zeno was one.  Mike -- my mind is going
12  blank.  Kevin Lynch.  And Mike -- I can't remember his
13  last name at this time.
14    Q.  And when you saw these depictions, did you
15  report it to anyone?
16    A.  Yes.
17    Q.  Who did you report it to?
18    A.  I reported it to Audra Jarman.  I actually told
19  her to go in the men's room and see it.  I showed her
20  the carts.  I reported it to the union committee man.
21    Q.  Who would that have been?
22    A.  Gary Meinhaldt, Justin Mikulsky, Pat Palmer.
23  All three of them.
24    Q.  Anybody else?

A23

36 (Pages 138 to 141)



**WILCOX & FETZER LTD.**

In the Matter Of:

# Petrocelli

## v.

# Chrysler Corporation

## C.A. # 04-CV-943-KAJ

---

Transcript of:

# Dino G. Petrocelli
## Volume # 2
## August 9, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A24

Petrocelli
Dino G. Petrocelli, Volume 2

v.

C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 9, 2005

Page 169

1  You know, it was not just that kind of
2  stuff, it was sexually explicit things and remarks
3  about people at work and --
4      Q.  So, let me stop you for a minute.  If I
5  understand, you spoke with the janitor about it and it
6  was cleaned up multiple times but it would just
7  reappear?
8      A.  No.  I am talking about other areas.  He just
9  gave up on it.  He gave up on it because --
10     Q.  Just to keep the record clear, I believe we
11  were talking about depictions in the bathroom?
12     A.  Yeah.  They were there for -- I mean, the
13  original ones were there since before and after I was
14  there.
15     Q.  When did you first see the first depiction that
16  you considered to be of you in the bathroom?
17     A.  Probably like late October, 2001.
18     Q.  So, in late October of 2001, you saw the first
19  depiction of you in the bathroom.
20         Can you tell me what that depiction was?
21     A.  It was like a snake with a sombrero, my name
22  underneath of it, jail, like, bars of a jail cell
23  around it, and then, you know, references to, you
24  know, me not speaking English and stuff like that.

Page 170

1  Some kind of little phrase underneath.
2      Q.  Do you remember what that little phrase was?
3      A.  Not exactly, no.
4      Q.  Is this the only depiction that you saw in late
5  October of 2001?
6      A.  That was the only one in the bathroom.  That
7  was the same one that I have seen when I was
8  discharged.
9      Q.  And I believe you mentioned that you spoke to
10  the janitor at DaimlerChrysler about that depiction?
11     A.  About -- no, just about, generally, about all
12  the drawings on the walls, you know, throughout the
13  whole plant.
14     Q.  Did you speak with anyone about this depiction
15  of you in the bathroom in terms --
16     A.  Yes.
17     Q.  -- of complaining?
18     A.  Yes.
19     Q.  Who did you speak to specifically?
20     A.  Audra Jarman, Gary Simpers, Glen -- Gary
21  Meinhaldt, Shannon Logan, J.T. Gooden, Ryan Fellon,
22  Marcal Christmas, Jeanie Patchel.  There was numerous
23  people.
24     Q.  I'd like you to tell me all the names.  Is that

Page 171

1  all the names?
2      A.  Pat Palmer, Dan Zeno, Kevin Lentz, Fred Norris.
3      Q.  Just so we are clear, these were all the people
4  that you complained to about this snake with sombrero
5  with your name on it and jail bars around it depiction
6  in the bathroom in late October of 2001?
7      A.  Yes.  Joe Saucerman, Sr., Anthony Bailey,
8  Stuart Freeman, Kara Todd, or actually, Kara Jones now
9  because she was married, and her husband, Kevin Jones,
10  the EAP rep., but I can't remember what his name was,
11  Mike Monger, M-o-n-g-e-r, Kristin Taggart, Jackie
12  Politakis, Beverly Lively, Roland Wells.
13         I'd have to look at the list because I
14  can't remember a lot of the names.  It's been three
15  years now since I have worked there.
16     Q.  I see you flipping through some documents,
17  Mr. Petrocelli, and that reminds me --
18     A.  Yes.
19     Q.  -- we should talk about the documents that you
20  brought with you.
21     A.  Yeah.  These are the documents that you wanted
22  me to bring in.
23     Q.  As we discussed yesterday, I believe you are
24  referencing the subpoena that we issued to you, which

Page 172

1  was included in the notice for your deposition.
2      A.  Yes.
3      Q.  I'd like to read the documents that we
4  requested to you in the -- requested of you of the
5  subpoena.
6         It reads, "Pursuant to Federal Rules of
7  Civil Procedure 30 (b)(5) and 34, DaimlerChrysler
8  hereby requests production of the following items from
9  Mr. Petrocelli:  One, all journals, diaries,
10  calendars, notes, or records kept by Mr. Petrocelli
11  concerning any aspect of his employment with
12  DaimlerChrysler or his legal claims; all employment or
13  personnel records in Mr. Petrocelli's possession
14  related to his employment with DaimlerChrysler; three,
15  all sound recordings or documents that concern any
16  aspect of Mr. Petrocelli's employment with
17  DaimlerChrysler or his legal claims; and, four, all
18  other documents and items that Mr. Petrocelli believes
19  are relevant to his employment with DaimlerChrysler or
20  to his claims in the above captioned lawsuit."
21         Do you remember receiving this notice?
22     A.  Yes.
23     Q.  Did you read through it?
24     A.  Yes.

A25

4 (Pages 169 to 172)

Petrocelli
Dino G. Petrocelli, Volume 2

v.

C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 9, 2005

Page 185

1 discussed?
2   A.  Just, basically, it was in -- in public view.
3 Even without discussing -- I mean, I really don't
4 think I had to tell anybody, you know, as far as the
5 men were concerned, because the men, it was in the
6 men's room.  It was in public view.  Anybody who went
7 in that bathroom knew that it was there and nothing
8 was done about it.  And, I mean, that goes with me
9 saying or not saying, you know, that it was there.
10          That's why, you know, there is a long list
11 of 37 people because people have actually come, you
12 know, to me, saying, you know, remarks about, you
13 know, what was in the bathroom.
14   Q.  Please tell me the next specific incident that
15 you feel supports your hostile work environment claim
16 and the date when it occurred?
17   A.  It's been several occasions, I don't have exact
18 dates, but it was from the range of, like, January of
19 2000, until my discharge, numerous times, depictions
20 on equipment, work equipment, in work areas, you know,
21 notes left on my work equipment, you know, referring
22 to burritos and tacos and Taco Bell bags and
23 references to me wearing a bandanna because it was hot
24 outside, and, you know, people were sweating in there.

Page 186

1 And then, you know, reference to me being in gangs and
2 calling me "Esse" and all that kind of stuff.  And I
3 was basically treated with disrespect.
4   Q.  I think I do have a clear understanding of the
5 general events that you claim support your hostile
6 work environment claim.  But what I want to try to get
7 to is specifics.  And if you can't remember specifics,
8 then you can just tell me that.
9          But are there any other specific incidents
10 that support your hostile work environment claim that
11 you can tell me about today?
12   A.  Well, from the control center, I was called
13 "Spic" numerous times.
14   Q.  And when did that happen?
15   A.  It was a few times, but the -- the last time I
16 recall was shortly before my discharge.
17   Q.  So, the only --
18   A.  I believe in December of 2001.
19   Q.  December, 2001, in front of the control center,
20 you were called a Spic?
21   A.  Yes.
22   Q.  Who called you a Spic?
23   A.  Tom McGloughlan.
24   Q.  Who witnessed Tom McGloughlan calling you a

Page 187

1 Spic?
2   A.  Audra Jarman, Shannon Logan, Jamie McGeough,
3 Joe Saucerman, Ryan Fellon.  I believe that was it.
4   Q.  Did you report this incident to anyone?
5   A.  Audra Jarman was right there.  I didn't report
6 it, no.
7   Q.  So, other than Audra Jarman standing there, you
8 did not report it to anyone?
9   A.  No.  Because that -- at that time, I had felt,
10 you know, my life -- my job was, you know, threatened,
11 as far as the discharges and all that.  I just wanted
12 do my job and get out.
13   Q.  Had someone threatened your employment at that
14 point?
15   A.  Well, numerous suspensions that I was getting,
16 you know, recently, kind of kept me to keep my mouth
17 shut and just stay out of trouble and just do my job
18 and -- and go home, and that was it.  That was my own
19 prerogative.
20   Q.  So, in terms of specific incidents so far that
21 you can remember, we have talked about the October
22 2001 depiction in the bathroom and the December 2001
23 name calling incident outside of the control center.
24          Any other specific incidents you can

Page 188

1 recall that support your hostile work environment
2 claim?
3   A.  References to myself going out with Shannon
4 Logan, you know, who was, you know, a white ethnicity
5 or race, white race.
6   Q.  When was that?
7   A.  About the end, I guess from maybe September of
8 2001.
9   Q.  And when you say "references," what,
10 specifically, are you talking about?
11   A.  People saying down -- "Are you down with the
12 brown tour"?, and all that kind of stuff.
13   Q.  "Down with the brown tour"?
14   A.  Yeah, I don't know, stupid kid stuff.
15   Q.  Any other specific comments or references?
16   A.  Depictions of both of us having sex all over
17 the billboards around work and making remarks that
18 both of us were in the parking lot having sex on, you
19 know, work property or in the back having sex on work
20 property, and just, basically, a lot of people were
21 just, you know, shooting at my reputation, diminishing
22 it with the comments and stuff they were making.
23   Q.  Any other comments besides "down with the brown
24 tour." depictions of sex --

A26

8 (Pages 185 to 188)

Page 189

1  A.  Well, just --
2  Q.  -- on billboards and having sex on work
3  property?
4  A.  A lot of just reading body language and stuff,
5  you could see a lot of people weren't comfortable with
6  the fact that I was going out with her.
7  Q.  Starting with the first comment, "down with the
8  brown tour," who said that?
9  A.  Kevin Linsmore.
10  Q.  Did anyone witness Kevin Linsmore saying it?
11  A.  I think Cameron Dansby and Marcal Christmas,
12  maybe Mark Jessamy.
13  Q.  And this was a comment made to you?
14  A.  Yes, or, you know, while I was with her.
15  Q.  Did you complain to anyone about this?
16  A.  No.
17  Q.  No verbal or written complaints to anyone?
18  A.  Maybe a verbal, but no written complaints, no.
19  Q.  Who did you make verbal complaints to?
20  A.  I believe Gary Meinhaldt.
21  Q.  Is that all?
22  A.  The EAP rep. when I mentioned, you know, I had
23  spoken with him about the different occasions of stuff
24  going on.

Page 190

1  Q.  What was Gary Meinhaldt's response when you
2  told him about this?
3  A.  He said he would speak with him.
4  Q.  Were you satisfied with that response at the
5  time?
6  A.  Yes.
7  Q.  Do you know whether he spoke to him or not?
8  A.  Yes.
9  Q.  What do you know about it?
10  A.  I -- I believe Kevin went and apologized to
11  Shannon and apologized to me.
12  Q.  So, it's your understanding that Gary did say
13  something to Kevin Linsmore, and, as a result, Kevin
14  apologized to you and he apologized to Shannon Logan?
15  A.  Yes.
16  Q.  Were you satisfied with that result?
17  A.  Yes, even though I knew it was going to happen
18  again because his, I guess his character --
19  Q.  The second reference that you made to your
20  relationship with Shannon was depictions of you two
21  having sex posted on billboards?
22  A.  Mm-hmm.
23  Q.  Do you know who did that?
24  A.  No.

Page 191

1  Q.  Did you complain to anyone about it?
2  A.  Yes.
3  Q.  Who did you complain to?
4  A.  I believe it was Gary Stollings and Gary
5  Meinhaldt.
6  Q.  Is Gary Stollings a supervisor?
7  A.  He is the union president.
8  Q.  And what, exactly, did you say -- well, let me
9  back up.
10      Did you talk to Mr. Stollings and
11  Mr. Meinhaldt together?
12  A.  Separately.
13  Q.  So, what did you say to Mr. Stollings first?
14  A.  I told him I didn't appreciate that kind of
15  stuff being posted around.
16  Q.  And what did he say?
17  A.  He said that people do that kind of stuff, you
18  know, I mean, it was taken down right away, and, you
19  know, he doesn't know who did it or anything like
20  that.  You know, stuff to that reference.
21  Q.  Just so I am clear, did he say that things are
22  generally taken down right away or were you saying
23  that this was taken down?
24  A.  That was taken down right away.

Page 192

1  Q.  Okay.  And did you subsequently have a
2  conversation with Mr. Meinhaldt then or at the same
3  time?
4  A.  No.  I believe that same night that I seen the
5  stuff on the -- on the board when I was clocking out.
6  Q.  And what did Mr. Meinhaldt say?
7  A.  Just, basically, disregarded it.  You know,
8  kind of laughed about it, I guess.
9  Q.  So, the first time with the "down with the
10  brown tour" comment, Mr. Meinhaldt spoke with Kevin
11  Linsmore, and -- and Kevin apologized, but this time,
12  with the depiction of you and Shannon having sex on
13  billboards, your testimony is that Mr. Meinhaldt
14  disregarded your comment and just laughed about it?
15  A.  Yes.  I mean, that's what I -- what I felt, you
16  know, it wasn't given attention.  That's why I called
17  Gary Stollings.
18  Q.  And as a result of your conversation with Gary
19  Stollings, the depictions were taken down off the
20  billboards?
21  A.  Yes.
22  Q.  And were you satisfied with that result?
23  A.  Actually, they were taken down -- minutes after
24  they were up there, somebody else had taken them all

A27

9 (Pages 189 to 192)

Petrocelli
Dino G. Petrocelli, Volume 2

v.

C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 9, 2005

Page 193

1  down so -- I guess one of the supervisors might have
2  done it, I don't know.
3  Q.  And you were satisfied with that result?
4  A.  Yes.
5  Q.  Did you feel that was prompt and quick action?
6  A.  Yes, in that situation, yes.
7  Q.  The next reference that you mentioned was
8  references to -- and I am not sure if this was
9  depictions or comments -- but to you and Shannon have
10  sex on work property?
11  A.  Yes.
12  Q.  Was -- was that a comment or a picture?
13  A.  That was a picture and comments.
14  Q.  Do you know who did those pictures and
15  comments?
16  A.  I don't know who did the pictures, no. The
17  comments came from Mark Jessamy, Doug Feldman,
18  Clarence Johnson -- excuse me -- Dan Zeno. I mean, it
19  was -- it was a great number of people because it was,
20  you know, throughout the whole warehouse. But those
21  are the ones that stick out right now.
22  Q.  Okay. Those are the ones that you can remember
23  at this time?
24  A.  Yes.

Page 194

1  Q.  So, that's with respect to comments about you
2  and Shannon having sex on work property?
3  A.  Yes.
4  Q.  So we are not talking about the pictures right
5  now, just the comments?
6  A.  The comments, yes. The pictures, I don't know
7  who did the pictures.
8  Q.  And did you complain to anyone about the
9  comments?
10  A.  Yes, Gary Meinhaldt, and, I think -- I believe
11  Justin Mikulsky was also involved in that.
12  Q.  Do you remember what you said to Mr. Meinhaldt?
13  A.  That I didn't want people going around saying
14  that kind of stuff about me because, you know, this is
15  a workplace and we are here to work and -- and this
16  kind of stuff going on is a -- is jeopardizing my job.
17  Something to that effect.
18  Q.  Is that kind of probably the same thing you
19  said to Mr. Mikulsky or something different?
20  A.  Yes.
21  Q.  Same?
22  A.  Basically the same thing, yes.
23  Q.  And what was the response that both of them
24  gave you?

Page 195

1  A.  I -- I believe they went and spoke to these
2  people about their comments.
3  Q.  Were you satisfied with that result?
4  A.  I guess as satisfied as I can be at that point,
5  yes.
6  Q.  And then with respect to the -- you said there
7  were some depictions of you and Shannon having sex on
8  work property?
9  A.  Mm-hmm.
10  Q.  Did you complain to anyone about that?
11  A.  Yeah. Those are the ones I complained to Gary
12  Stollings and Gary Meinhaldt.
13  Q.  And then -- oh, if I recall correctly, then,
14  those were taken down pretty quickly?
15  A.  Yes.
16  Q.  Okay. And then, finally, you have mentioned a
17  category of just some body language reference -- body
18  language references to you and Shannon being in a
19  relationship.
20      Can you tell me more about what that --
21  what you mean when you say "body language"?
22  A.  You know, like people bumping into me when they
23  walk by, or, you know, staring or looking at me, you
24  know, just, you know, not in a friendly manner.

Page 196

1  Q.  And who did that, if you know?
2  A.  Dave Petrous, Carl Roehonan, some people during
3  the day shift, but I don't -- I don't even know their
4  names, Dan Zeno, and that -- I think that was,
5  basically, you know, the majority of them.
6  Q.  Did you claim -- complain to anyone about those
7  incidents?
8  A.  In a general manner, I did, yes.
9  Q.  Do you remember a specific complaint to anyone?
10  A.  To Justin Mikulsky, I think, at one point, Dave
11  Petrous, for an unknown reason to me, like, was
12  challenging me, saying something like, Bring it on big
13  guy, or something like that or, you know, reference to
14  fighting with me or something like that.
15  Q.  Did you also report that?
16  A.  Yes, to Justin Mikulsky.
17  Q.  And what did Justin say in response?
18  A.  He spoke to David Petrous and then, through
19  Justin Mikulsky, David Petrous apologized but didn't
20  apologize to me personally.
21  Q.  So, if I understand correctly, you complained
22  to Justin Mikulsky and he spoke with Dave Petrous
23  about it, and through Justin, Dave Petrous apologized?
24  A.  Yes.

A28

10 (Pages 193 to 196)

Petrocelli
Dino G. Petrocelli, Volume 2

v.

C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 9, 2005

Page 197

1   Q.   And were you satisfied with that result?
2   A.   Not exactly, no. I didn't feel comfortable at
3   all, you know, working around Dave Petrous.
4   Q.   What more did you think that Justin Mikulsky
5   should have done in response besides talking to him?
6   A.   I think that's basically all he could --
7   Q.   Let me finish my question.
8        What else did you think Justin should have
9   done besides speaking with Mr. Petrous about it and
10  having him apologize to you, or soliciting an apology?
11  A.   I think that was about all that Mr. Mikulsky
12  could have done, you know, just to alleviate, you
13  know, the situation at that time, but as far as, you
14  know, the future and all that, it wasn't nothing -- I
15  mean, I still was working with Dave Petrous around the
16  warehouse and everything, and, you know, I really
17  didn't feel comfortable around him.
18  Q.   Moving on. We have talked about three specific
19  incidents that you claim support your hostile work
20  environment claim; those are the October 2001 incident
21  of a depiction in the bathroom, being called a Spic in
22  front of the control center in December of 2001, and
23  references to going out with Shannon Logan in
24  September of 2001.

Page 198

1        Are there any other specific incidents
2   that you can recall that support your hostile work
3   environment claim?
4   A.   I believe when they took my duffle bag and --
5   and packed it with wax towels, you know, would be
6   justified as a cause of a hostile work environment.
7   Q.   I know we talked about that yesterday, but can
8   you tell me when that occurred again?
9   A.   I can't recall a date.
10  Q.   A rough time frame?
11  A.   In 2000 -- 2001. I know it was after September
12  11th.
13  Q.   Do you recall how close it -- it was to the
14  time when you left your work with DaimlerChrysler,
15  which I believe was in January of 2002?
16  A.   No. I would have to look it up in the -- in
17  the papers or something. I can't recall exactly what
18  day.
19  Q.   And tell me about that incident and why you
20  feel it supports your hostile work environment claim?
21  A.   The incident involved me asking for my bag,
22  which had disappeared the night before. When I asked,
23  you know, Dawn Reese, she said she had seen -- that
24  they had found a bag, to ask Carl Roehonan or Bob

Page 199

1   Mayou. When I asked them, they didn't act like they
2   didn't know anything. And Bob may have mentioned
3   something about finding a shirt or something, you
4   know, something that was off the wall. And I told
5   them I would ask somebody in security and hopefully
6   they would know.
7        And when I went there, he asked for a
8   description of the bag. I gave him a description.
9   And then I, you know, was told that if they find it,
10  they will let me know.
11       The whole time, they are acting like they
12  didn't know where my bag was, but, in the meantime, it
13  was sitting in the -- in the conference room on top of
14  the table.
15       When they called me back to the office to
16  get my bag off the conference room table, they
17  asked me to open it up, and there, you know, inside
18  was some packs of wax towels. Then they had suspended
19  me for stealing.
20  Q.   What -- how long of a suspension did you
21  receive?
22  A.   I believe, at that time, it was like an
23  indefinite suspension and then I was called back to
24  work. I don't know exactly the time frame.

Page 200

1   Q.   You mentioned Dawn Reese?
2   A.   Yes.
3   Q.   And Dawn was here with us yesterday?
4   A.   Yes.
5   Q.   During the time when you worked for
6   DaimlerChrysler, did you know Dawn?
7   A.   Yes.
8   Q.   What was your understanding of her job or where
9   she worked?
10  A.   Human relations.
11  Q.   Did you have a friendly relationship with her
12  at the time you worked for DaimlerChrysler? In other
13  words, did you feel comfortable talking to her?
14  A.   Not really, no.
15  Q.   And why do you say that?
16  A.   I mean, we were friendly, but I didn't feel
17  comfortable talking to her.
18  Q.   Why didn't you feel comfortable talking to her?
19  A.   Well, she was -- I didn't -- you know what I
20  mean, she worked real close with management, and the
21  situation I was in with management, I didn't feel like
22  she was the right person to speak to about any
23  problems that I had.
24  Q.   Did you know where Dawn's office was located?

A29

11 (Pages 197 to 200)

Petrocelli
Dino G. Petrocelli, Volume 2

v.

C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 9, 2005

Page 201

1   A. Yes.
2   Q. Had you ever, during your time at
3   DaimlerChrysler, gone to her office and spoken to her?
4   A. Yes.
5   Q. And you said you understood that she was the
6   human resources person?
7   A. Yes.
8   Q. Back to the duffle bag incident, did you report
9   that to anyone as being an event that you felt
10  constituted harassment or discrimination?
11  A. Yes.
12  Q. Who did you report it to?
13  A. The Department of Labor.
14  Q. Anyone within DaimlerChrysler Corporation?
15  A. To the committee person that was there, Keith
16  Holovik, and, I believe, Pat Palmer.
17  Q. Pat Palmer, and I didn't catch Keith's last
18  name?
19  A. Keith Holovik.
20  Q. Holovik?
21  A. Yes.
22  Q. And what did you say to Keith and to Pat
23  Palmer?
24  A. Do you want to know exactly?

Page 202

1   Q. Please.
2   A. I said, "This is bull shit."
3   Q. And what was their response?
4   A. They were just surprised that, you know, that
5   that was going on. I said, "This is bull shit. I
6   mean, I don't even have a car. Why would I steal
7   these towels"?
8   Q. And what was their response?
9   A. They said they would straighten it out, they
10  would find out what's going on because they found it
11  to be, you know, kind of odd, too, that I would take a
12  bunch of rags for cars when I didn't even have a car
13  at that time.
14  Q. Do you know if they followed up on it?
15  A. Yes.
16  Q. And tried -- and straightened it out?
17  A. Yes.
18  Q. Did they straighten it out?
19  A. Yes.
20  Q. And you were eventually brought back to work?
21  A. Yes.
22  Q. Were you satisfied with that result?
23  A. I was satisfied with the result as far as
24  coming back to work, but I wasn't satisfied with the,

Page 203

1   you know, the hitting on my reputation and, you know,
2   being looked at as a thief from then on.
3   Q. But in terms of their response, were you
4   satisfied with it?
5   A. Yeah. I was satisfied I was back to work, yes.
6   Q. Was the complaints that you made to Pat Palmer
7   and to Keith Holovik, were those in writing or verbal?
8   A. Verbal.
9   Q. So, so far we have four incidents that support,
10  specific incidents that you believe support your
11  hostile work environment claim.
12       Are there any others that you can mention?
13  A. The harassment, basically, from the
14  supervisors. I mean, it was just a constant
15  harassment.
16  Q. Now, as I mentioned, I am -- I think I am clear
17  on the general claims that you say support your
18  hostile work environment claim, but in terms of
19  specifics, are there any specific incidents about
20  supervisor harassment that you just mentioned that you
21  can tell me about?
22  A. They would sign off my work assignments and say
23  that I signed off, or, not just me, but, you know,
24  everybody. But it seemed they tried to use that

Page 204

1   against me as far as, you know, the misconduct, codes
2   of misconduct, saying that I signed off for work
3   assignment when I didn't. And they did --
4   Q. And you said that was -- I am sorry. Go ahead.
5   A. They, basically, signed me off, I believe it
6   was like, like close -- the second half of the night
7   or something, when I was on assignment, I was still
8   taking it, and they had signed me off just to close
9   the routes up. And, meanwhile, I was still picking
10  the assignment. And they -- they used that against
11  me, saying that I was, I guess, misleading management
12  by signing off and -- and continuing to work on my
13  assignment. But, you know, I didn't -- I never signed
14  off.
15  Q. And what time period did that happen in?
16  A. In 2001, I believe.
17  Q. Can you nail it down anymore specifically than
18  that?
19  A. I -- I'd have to look through the papers to get
20  an exact day. I know I have grievances and stuff like
21  that in my paperwork.
22  Q. And you said that happened with others as well,
23  not just you?
24  A. Yeah. They always signed off people's

A30

12 (Pages 201 to 204)

Petrocelli
Dino G. Petrocelli, Volume 2

v.

C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 9, 2005

Page 205

1  assignments --
2    Q.  Who else --
3    A.  -- to close the accounts.
4    Q.  -- did that happen to?
5    A.  I can't really remember exactly who, but I
6  know, you know, there has been times when people were
7  complaining that that was going on.
8    Q.  Did you report this to anyone?
9    A.  Well, no, I didn't report that.  It -- it was
10  actually involved in a suspension that they had given
11  me, I believe.
12        MS. PAGE:  I think we need to pause for a
13  moment to change the tape.
14        VIDEO TECHNICIAN:  Going off the record at
15  5:10 p.m.
16        VIDEO TECHNICIAN:  Going back on the
17  record at 5:12 p.m.
18  BY MS. PAGE:
19    Q.  Before the break, we were talking about an
20  incident involving signing -- management signing off
21  on your work assignment sheets or worksheets?
22    A.  Mm-hmm.
23    Q.  And you said that you did not complain to
24  anyone about that.  But I thought I heard you say

Page 206

1  there was a grievance involved?
2    A.  I believe so.  I believe that's -- that -- they
3  used that as just, you know, saying I was loafing
4  again or something, you know, to that regard.
5    Q.  So, the grievance was the result of your
6  complaints or not?
7    A.  I believe it was a result of me being
8  suspended.
9    Q.  Okay.  Any other incidents, specific ones that
10  you can think of that support your hostile work
11  environment claim?
12    A.  Remarks by Steven Gwen about my religion, you
13  know, saying that he was brought up in Philly, and
14  before he knew I was of Hispanic descent, he would
15  talking about the Mulions and the Spics, you know,
16  taking over the neighborhood in Philly, and, you know,
17  references to black people at work and stuff like
18  that, you know, as far as Mulions.  And when he found
19  out I was Hispanic, he kind of like stood off a little
20  bit from me.  And he seen -- one day, he seen a cross
21  around my neck and asked me if I practiced Catholicism
22  and I said, "Yes," and he looked surprised at me.  And
23  he -- he said, "Well, I thought you people practiced
24  "Santaria" or Voodoo or something like that," and

Page 207

1  laughed.
2    Q.  Did you complain about those verbal complaints
3  to anyone?
4    A.  Yes.
5    Q.  Who did you complain to?
6    A.  I believe it was John Turnbull.
7    Q.  Is John Turnbull a supervisor or a union
8  person?
9    A.  He was union president at the time.
10    Q.  And what did you say to John Turnbull?
11    A.  I told him I didn't like that remark, you know,
12  I didn't like the way he -- he asked me that kind of
13  -- type of question.
14    Q.  And what was John Turnbull's response?
15    A.  I really don't think he knew how to respond.  I
16  think he was surprised by, you know, that kind of, you
17  know, something like that coming out of a supervisor's
18  mouth.
19    Q.  Did he discuss any action that he was going to
20  take or --
21    A.  No.
22    Q.  -- anything along those lines?
23    A.  No.
24    Q.  Are you aware that he did anything in response

Page 208

1  to your complaint?
2    A.  I don't believe he did, no.
3    Q.  Was that a verbal or written complaint?
4    A.  Verbal.
5    Q.  Did you ever follow-up with John Turnbull to
6  find out if anything had been done about it?
7    A.  No.  I just avoided Mr. Gwen as much as I
8  could.
9    Q.  Any other specific incidents that support your
10  hostile work environment claim that you can recall?
11    A.  I think the abuse of the, you know, the
12  misconduct procedure.
13    Q.  And when did that happen, time frame wise?
14    A.  I think -- I mean, I think maybe the end of
15  1999 or -- or beginning of 2001, all the way to my
16  discharge.
17    Q.  So, that sounds more to me like a category as
18  opposed to a specific incident.
19        Are there any specific incidents of abuse
20  of the misconduct procedure that you can tell me
21  about?
22    A.  Specific -- well, yeah, my final discharge,
23  they skipped one step in their procedure.  Instead of
24  giving me three weeks off without pay, they just went

A31

13 (Pages 205 to 208)

Petrocelli
Dino G. Petrocelli, Volume 2

v.

C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 9, 2005

Page 209

1  right to the termination. I was given, you know, down
2  the procedures, except for the third step, which is
3  three weeks off. They went from two weeks to one
4  month and then out the door.
5      And another ex-employee that was working
6  there, they actually suspended him twice for 30 days
7  to kind of give him a chance to, you know, do what he
8  had to do to keep his job, but he didn't want his job
9  anyway, and he just took advantage of it.
10  Q.  I think I am a little bit confused. You
11  mentioned that you were off for two weeks and then for
12  a month?
13  A.  Yes.
14  Q.  But that they were supposed to give you three
15  weeks off?
16  A.  Yes.
17  Q.  Did that -- the two weeks and the month count
18  as the three weeks?
19  A.  No.
20  Q.  So, you are saying that you were supposed to
21  have gotten another three weeks?
22  A.  I should have been -- excuse me, I am sorry.
23  Q.  That's okay.
24  A.  I should have been brought through the

Page 210

1  procedure, and they didn't follow the procedure as far
2  as the conduct -- or misconduct, you know,
3  disciplinary procedure that they have.
4  Q.  And I assume, in terms of time frame, we are
5  talking about January of 2002 --
6  A.  Yes.
7  Q.  -- roughly?
8      Did you complain to anybody about your
9  view that the procedures weren't followed?
10  A.  Yes.
11  Q.  Who did you complain to?
12  A.  To Gary Stollings and Gary Meinhaldt, Pat
13  Palmer, George Wingo.
14  Q.  Wingo?
15  A.  Wingo, yes, and Tom Tulley.
16  Q.  Is Tom Tulley a supervisor or a union person?
17  A.  He works in the union, yes.
18  Q.  Was that -- was that a written or a verbal
19  complaint?
20  A.  That was a verbal complaint, which they said
21  they were going to include what I was saying -- a
22  statement that I had made, they were going to include
23  that into my grievance with mentioning, you know, that
24  the procedure wasn't followed.

Page 211

1  Q.  Were you satisfied with that result?
2  A.  Yes.
3  Q.  What, ultimately, happened as a result of your
4  complaint and subsequent grievance?
5  A.  Well, I was discharged. I was paid all my
6  vacation time and my P.A., personal absence allowance
7  time, and told my seniority was terminated and
8  everything. Basically, lost, you know, my job.
9  Q.  So, when you say -- you say you were satisfied
10  with the result, what aspect of that were you
11  satisfied with?
12  A.  I was satisfied that they were doing something,
13  you know, to help me, you know, get my job back.
14  Q.  And what -- what was the result of their
15  efforts to help you get your job back?
16  A.  I believe probably a few -- maybe five months
17  later, I was offered my job back with Chrysler, but
18  that was after an appeal board and all that met.
19  Q.  So, it sounds like you worked through the
20  process, the union process for grievances?
21  A.  Yes.
22  Q.  And you were offered your job back, ultimately;
23  is that correct?
24  A.  That's correct. But they -- they also knew

Page 212

1  that I wasn't capable of coming to work, and I believe
2  that that was just to done to you, you know, basically
3  finish me off finally. They went through the
4  procedure and finish off, you know, kind of wash their
5  hands of me because they knew I wasn't capable of
6  coming in at that time.
7  Q.  And that's an action that you think
8  DaimlerChrysler took against you?
9  A.  I believe so, yes.
10  Q.  Was it DaimlerChrysler that offered you your
11  job back or was it through the -- through your
12  grievance with the union?
13  A.  Through my grievance with the union -- and,
14  see, I -- I was really unclear with that. As far as I
15  know, the local union didn't know anything about the
16  job offer. It was through the international union
17  that they had an appeal board and all that.
18  Q.  But it was certainly either through the local
19  union or the national union that you were offered your
20  job back?
21  A.  Yes.
22  Q.  But you felt like that was done in retaliation
23  somehow?
24  A.  Yes.

A32

14 (Pages 209 to 212)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Petrocelli
Dino G. Petrocelli, Volume 2

v.

C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 9, 2005

Page 213

1  Q.  In retaliation for what?
2  A.  For filing charges with the Department of
3  Labor, with the EEOC.
4  Q.  So, just so I understand your testimony, you
5  are claiming that you were retaliated against by the
6  union getting you your job back?
7  A.  No, not retaliated by the union, retaliated by
8  the -- the Chrysler Corporation.  I think the union
9  was trying to get my job back.  Chrysler didn't have
10  any intention of giving me my job back.  I think in
11  order to comply, you know, with the demands from the
12  appeal board and to make it seem like they were, you
13  know, complying with -- with me and trying to offer my
14  job back is why they did it because they knew I wasn't
15  able to come in.  I mean, that's my belief because it
16  was five months after I was discharged.
17  Q.  Do you know how long after you -- or, excuse
18  me, how -- how long after the appeal board ordered
19  that you be offered your job back and when
20  DaimlerChrysler actually offered you your job back?
21  A.  No.  I don't know.
22  Q.  When were you -- when was the first time that
23  you were incarcerated?  In other words, what month did
24  you become incarcerated?

Page 214

1  A.  In March.
2  Q.  And how long were you incarcerated?
3  A.  Close -- close to eight months.
4  Q.  So, you are claiming that DaimlerChrysler
5  Corporation retaliated against you by offering your
6  job back, as it was directed to do by the union,
7  during the time when you were incarcerated?
8  A.  I believe that they didn't have any intentions
9  of giving me my job back.  I believe --
10  Q.  Is it true --
11  A.  -- that --
12  Q.  Go ahead.
13  A.  I am sorry.  I believe that since they knew
14  that I was incarcerated, I wasn't able to -- to report
15  to work, that was their opportunity to wash their
16  hands of me.  That's what I believe.  I believe that
17  because of the, you know, because of the harassment
18  and everything that I was going through while I was
19  working at Chrysler to constantly put me out the door
20  for suspensions on bogus misconduct violations and
21  stuff like that.
22  Q.  Was it anything having to do with
23  DaimlerChrysler's doing that caused you to be
24  incarcerated?

Page 215

1  A.  I think a lot of it had to do with the
2  treatment that I was getting there, that I -- I was
3  losing my self esteem, and I was, you know, getting
4  lost in -- in drinking and drugs because of the
5  situation that I was going through at work.  I mean,
6  it's a lot of stress at work when you have somebody,
7  you know, on you all the time, pushing you out the
8  door, suspending you, writing you up.  And, you know,
9  I really had nobody to help me with it because I
10  worked nights.  Everybody I knew worked during the day
11  that I could, you know, console with.
12       You know, eventually I tried to seek help
13  for counseling and all that, but, you know, it just,
14  it's -- as far as support group for a while, but it --
15  I guess it just wasn't enough.
16  Q.  You were incarcerated during the time when
17  DaimlerChrysler invited you back to work; is that
18  correct?
19  A.  Yes.
20  Q.  You were incarcerated due to a conviction for
21  possession of a controlled substance, specifically,
22  cocaine; is that correct?
23  A.  Yes.
24  Q.  Were there any other incidents that you claim

Page 216

1  are in support of your hostile work environment claim?
2  A.  People insinuating that I was drinking on the
3  job or saying that I was drinking on the job or acting
4  violent or acting this way or that way.
5  Q.  Is that a specific incident, or is that, again,
6  a general category?
7  A.  It's a general category.
8  Q.  And if you can pin it down to a specific
9  incident, please tell me.
10  A.  Okay.  One suspension that I have, Steven Gwen,
11  for some reason, I was working in the work area, the
12  -- the aisles were too small to fit in with the carts
13  and the equipment that we were given, and there was
14  always complaints by union officials and by employees
15  that the area was too small, unsafe, and all that.
16  You know, they had discussions about it.
17       While pulling into there, you know,
18  eventually, a lot of people would hit the cages, which
19  are the, you know, the big metal cages they would
20  stock boxes in and knock stuff around.
21       Well, that happened to me one time, but my
22  cart got stuck in the aisle.  As I was getting off my
23  cart, excuse me, I -- my foot got crushed between the
24  tote and the PIV cart, which, eventually, I found out

A33

15 (Pages 213 to 216)

Petrocelli                                         v.                      Chrysler Corporation
Dino G. Petrocelli, Volume 2                                               August 9, 2005
                                              C.A. # 04-CV-943-KAJ

Page 217

1   that I fractured my foot. When I stepped in it, it
2   just doubled over and fractured.
3         So, you know, I -- I became angry, and I
4   -- I yelled, you know, and I, in pain, basically, and
5   Mr. Gwen wrote it off as being violent in the work
6   place and saying I was throwing stuff around and that
7   I intentionally hit, you know, things with the -- with
8   the equipment. And, you know, then spread it around
9   that I was violent, and everybody, you know, was kind
10  of scared of me and, you know, thinking that I was
11  some violent maniac.
12  Q.  When did that happen?
13  A.  I believe it was in '99.
14  Q.  Did you report that to anyone?
15  A.  Actually, I was suspended, so it was reported
16  to my committeeman, I believe was Gary Meinhaldt at
17  the time.
18  Q.  Did you initiate the filing of a grievance?
19  A.  Yes.
20  Q.  And what was the result of that?
21  A.  I was brought back after, I believe it was five
22  days.
23  Q.  And were you satisfied with that result?
24  A.  I couldn't come back to work because my foot

Page 218

1   was fractured, so it actually took longer for me to
2   get back.
3   Q.  But were you satisfied with the result of the
4   grievance process?
5   A.  Not exactly, no.
6   Q.  And why is that?
7   A.  Because of the story that was given, blatant
8   lies by Mr. Gwen and Tammy, another supervisor there,
9   stating, you know, something totally different than
10  what had actually happened in their reports.
11  Q.  I understand that you were not pleased with the
12  incident, but were you pleased with the grievance
13  procedure and the result?
14  A.  I was pleased to get my job back, yes.
15  Q.  Any other incidents?
16  A.  Like I said, there were many incidents.
17  Q.  Any other specific ones that you could mention?
18  A.  Mark Jessamy stating that I am a lazy Latino
19  and that I screwed it up for everybody in Latino to
20  get a job there, and laughing about it.
21  Q.  When did that happen?
22  A.  I believe it was after my first two suspensions
23  for misconduct.
24  Q.  So, in terms of the date, that would be --

Page 219

1   A.  In 2000, I believe.
2   Q.  Month?
3   A.  I don't remember. I mean, it's kind of
4   difficult -- I mean, if I knew there was going to be
5   dates and all that kind of stuff asked, I probably
6   would have prepared myself more. I mean, it's hard,
7   you know, being represented by myself or no attorney
8   or anything like that, as far as remembering dates and
9   specifics, and the information I am giving you is
10  basically to the best of my knowledge.
11  Q.  I understand that. And the purpose of your
12  deposition is for me to get as detailed of information
13  from you as possible, and I can't give you legal
14  advice in terms of telling you what to do, but that is
15  the purpose of the deposition, so, to the best of your
16  ability today, do you have a date for that incident?
17  A.  Probably in November of 2000.
18  Q.  Did anyone witness that incident?
19  A.  Yes.
20  Q.  Who witnessed it?
21  A.  Marcal Christmas, Anita Backus. I can't
22  remember that guy's name. There was one guy -- I
23  can't remember -- I can't remember his name. I don't
24  believe he worked second shift. He might have worked

Page 220

1   third shift. The list I have is just second shift.
2   Q.  How would somebody on third shift there witness
3   an incident that happened on second shift?
4   A.  Because the -- their starting time coincides
5   with our shift work.
6   Q.  I understand.
7         Where did this incident happen in terms of
8   where in the warehouse?
9   A.  In the break room.
10  Q.  I am sorry?
11  A.  In the middle break room.
12  Q.  And did you report it to anyone?
13  A.  No. I just blew it off.
14  Q.  Any other specific incidents that you can
15  mention?
16  A.  Working on the dock, when I was working on the
17  dock and when I got off of the dock, Ray Seward would
18  make comments about Mexicans and stuff, and, you know,
19  referring to me.
20  Q.  When did this happen?
21  A.  Maybe in February of '98.
22  Q.  And what did he say?
23  A.  You know, references to mushroom picker and
24  Spic, you know, acting like he was going to run me

A34

Petrocelli
Dino G. Petrocelli, Volume 2

v.

C.A. # 04-CV-943-KAJ

Chrysler Corporation
August 9, 2005

Page 221

1  over with his forklift.
2  Q.  Did anyone witness this behavior?
3  A.  Yes.
4  Q.  Who witnessed it?
5  A.  Justin Mikulsky, Steve Politakis, but he had
6  past away now, Shawn Glass, I think Roland Wells, who
7  was on my team, Roland Wells.  That's about it.
8  Q.  Did you report this to anyone?
9  A.  I reported it -- I believe because Shawn Glass
10 was the committeeman at that time for the dock, I
11 didn't really have to report it to him, he was there
12 and he had seen it.
13 Q.  Did he say anything to you about it?
14 A.  No.  They just put it off as, you know, a big
15 joke.
16 Q.  So, when you say "they put it off," did you
17 have a conversation with Mr. Glass about it?
18 A.  Just a general conversation, yes.
19 Q.  Nothing in writing?
20 A.  No.
21 Q.  Any other incidents?
22 A.  People on their equipment, you know, the -- the
23 jitney drivers almost running me off the work, you
24 know, the common passage areas, like I wasn't there or

Page 222

1  something, you know, they would just ride right,
2  almost right into me.
3  Q.  When did that happen?
4  A.  On a few occasions.  Sometimes if I worked
5  overtime and some of the first shift guys were there,
6  most of them would do it.
7  Q.  Time frame?
8  A.  Maybe March or April of '98 or '99.
9  Q.  Who were these people who were running you off
10 with the --
11 A.  I don't even know their names.
12 Q.  Did you report this to anyone?
13 A.  I might have made a general statement, but I
14 didn't make any -- I didn't make any reports.
15 Q.  Who did you make a general statement to?
16 A.  To Justin Mikulsky, Ryan Fellon, Shannon Logan,
17 I remember making comments to her, it might have been
18 after.
19 Q.  Is Mr. Fellon a supervisor?
20 A.  No.
21 Q.  So, in terms of your conversation with
22 Mr. Mikulsky, what was his response?
23 A.  He just laughed it off, basically.  David Hart
24 was one supervisor I did mention it to.  He was the

Page 223

1  supervisor for the overtime.
2  Q.  And what was Mr. Hart's response?
3  A.  Basically blowing it off, saying, you know,
4  they are a bunch of old farts, you know, don't worry
5  about it.
6  Q.  Were you satisfied with that response?
7  A.  No.
8  Q.  Was anything done about it?
9  A.  No.
10 Q.  Were those general statements in writing or
11 verbal?
12 A.  Verbal.
13 Q.  Any other specific incidents besides the ones
14 we have talked about?
15 A.  Not that I can recall, no.
16 Q.  Moving onto the second claim that you have
17 mentioned, which was -- and I am flipping back through
18 my notes here -- discrimination based on your race and
19 ethnicity, are there any specific incidents in support
20 of that claim that are different or in addition to the
21 ones we have already talked about?
22 A.  Mostly, basically, the same thing, you know,
23 the hostility and -- and the racial remarks, all that
24 was mainly -- mainly intertwined.

Page 224

1  Q.  Did you ever make a written complaint about the
2  alleged discrimination based on your race and
3  ethnicity that you felt you were going through?
4  A.  Like I mentioned before, I was basically trying
5  to keep my job, so I didn't make any written
6  complaints.  I just verbally made complaints because
7  of fear of losing my job because of the situation I
8  was in.
9  Q.  Do you recall ever attending any anti
10 harassment training as an employee of DaimlerChrysler
11 Corporation?
12 A.  I believe so, yeah, as far as stereotyping
13 people and all that.
14 Q.  Do you remember a sign off sheet where you
15 would have signed off attending such a session?
16 A.  I believe so, yeah.
17 Q.  Do you remember what was discussed during that
18 harassment training?
19 A.  Not -- I think it was basically involving
20 people's sexual orientation, mainly, because somebody
21 had made a -- made a remark to Audra Jarman about her
22 being a lesbian and she was offended, and, right away,
23 they, you know, had a meeting.  So, it was mainly
24 sexual orientation and discrimination and sexual

A35

17 (Pages 221 to 224)